Wilde J.
I concur in the opinion of my learned brother, and am fully satisfied with the reasons given to support it. This, however, being a case of great interest, not only to the parties, but to the public also, I feel bound to go over the grounds of discussion, and more at large than I should think necessary or useful in a case of ordinary importance.
I shall, however, pass over one branch of the case without remark, namely, that which relates to the ancient title of Harvard College ; because I am of opinion, that there has been no legal or equitable transfer of this title to the plaintiffs. It is admitted that there has been no legal assignment from the college, and it appears to me equally clear, that nothing has been shown, that can amount to an assignment in equity. The plaintiffs contend, that by the payment of the annuity of 2001. to the college, they became purchasers of the right to the ferry ; that an agreement on the part of the college to assign, may be presumed ; and that in equity, an agreement to assign is equivalent to an actual assignment. But I think the basis of this argument wholly fails, because I cannot perceive that the payment of the annuity, under the circumstances of the case,-has *475 any tendency to prove a purchase of the college right. This annuity was paid in pursuance of an express provision in the plaintiffs’ act of incorporation. It was the price paid for their charter ; and which was to be reimbursed to them by the tolls. The annuity therefore has been eventually paid by the public ; and the case, in my opinion, stands on the same footing as it would, provided the annuity had been made payable into the public treasury, and the government had made compensation to the college. If, therefore, there was a purchase of the college rights, the government, and not the plaintiffs, must be regarded as the purchasers. I cannot however view the transaction in the light of a purchase ; the intention unquestionably was to extinguish the right of ferry, and to provide an equivalent ; which I think is apparent from the language of the plaintiffs’ act of incorporation. For the annuity to the college was not to cease at the expiration of the plaintiffs’ charter ; but the bridge was then to revert to the Commonwealth, “ saving to the college a reasonable and annual compensation for the annual income of the ferry which they might have received had not such bridge been erected.” So that it is clear, I think, that the right of ferry was intended to be extinguished, and in no event to be revived. ' And it was accordingly extinguished by the acquiescence of the college. That it was so considered at the time by the plaintiffs themselves, I can have little doubt; otherwise it would be difficult to account for their neglecting to require from the college a transfer of their franchise. But however this may be, I am clearly of opinion that the plaintiffs have derived no right or title from the college. I consider then the plaintiffs’ rights, whatever they may be, as exclusively derived from the grants of government under the acts of 1784, c. 53, and of 1791, c. 62, and the case, in my opinion, altogether depends on the true construction of these acts.
The rule of construction as to royal grants seems to be perfectly well settled, as laid down by Blackstone, 2 Com. 347. When they are made at the suit of the grantee, they shall be taken most beneficially for the king ; contrary to the grants of common persons. Thus if the king grants land to one and his heirs male, this is merely void ; for it is not an estate tail, as there are no words of procreation, Stc. and it is not a fee sim *476 pie, because it may reasonably be presumed that the king only intendea to give an estate tail. So if the king makes a grant of lands and the mines therein contained, and royal mines are found therein, they shall not pass. And so if the king grants lands or a rent, and limits no particular estate in the gift, the grant is void, and the patentee has not an estate for life, nor even an estate at will.
The reason given is, that in grants proceeding from the ap plication of the subject, the grantees ought to know what they ask, and if that does not appear, nothing shall pass from the king, by reason of the uncertainty. Bac. Prerog. F 2.
So also if the king grants the right to seize and bring in for adjudication all ships of the enemy, yet this does not deprive the king of the power afterwards to except certain ships or particular classes of the enemy’s ships. For it does not bind the crown in its power of qualifying the right granted, by subsequent modifications which the public good may require. For the general presumption is, says Lord Stowell, that the government does not mean to divest itself of this universal attribute of sovereignty, unless it is clearly and unequivocally expressed. And again, Lord Stowell remarks, “ against an individual it is presumed, that he meant to convey a benefit with the utmost liberality that his words will bear. It is indifferent to the public in which person an interest remains. With regard to the grant of the sovereign it is far otherwise. It is not held by the sovereign himself as private property ; and no alienation shall be presumed, except that which is clearly and indisputably ex pressed.” The Elsebe, 5 Rob. Adm. R. 163.
I am not aware of any good reason why the same general rule of construction should not be applied to grants from the legislature, especially when they relate to objects connected with the public interest or convenience. I confess, however, that I am not prepared to adopt all the English decisions on this point; some of which (and particularly the case cited as «eported by Sir John Davies) appear to me to have pushed the privilege of the royal prerogative to an extent inconsistent with the principles of impartial justice. But in doubtful cases, •it seems to me a sound and wholesome rule of construction, to interpret public grants most favorably to the public interest, *477 and that they are not to be enlarged by doubtful implications. It is said that all the prerogatives of the crown must be for the advantage and good of the people, otherwise they ought not to be allowed by the law. Moore, 672. Whether this be the correct theory of the British government or not, it is certain that under our form of government, every branch of the sovereign power is to be exercised for the benefit, accommodation and happiness of the people. When, therefore, the legislature makes a grant of a public franchise, it is not to be extended by construction beyond its clear and obvious meaning ; more especially when the question of interpretation relates to exclusive privileges, which all, more or less, tend to monopolies ; though some are very properly allowed, for the encouragement of invention and enterprise. If this rule of construction be not observed, the hands of the legislature may be tied against their will, and they may be injuriously restrained in the exercise of the important power and duty of providing for the public welfare.
There are some legislative grants, no doubt, that may admit a different rule of construction, such as grants of land on valuable consideration and the like. It is said that when the king’s grants are upon valuable consideration, they shall be construed favorably for the patentee for the honor of the king. Bac. Prerog. F 2. But to bring a grant within this exception to the general rule of construction, the grantee must show a consideration in some measure adequate, as well as valuable.
I proceed now to consider what, according to these estab lished principles, is the true construction of the act of 1784, c. 53, and that of the additional act of 1791, c. 62.
It has been denied by the defendants’ counsel, that the latter act or grant was accepted by the corporation ; but there was an express acceptance before the expiration of the first grant; and I see no reason why this acceptance was not in season. But without that, the previous acts of the corporation are sufficient to authorize the Court to presume an acceptance. Grants beneficial to corporations may be presumed to be accepted, as well as grants to individuals, and an express acceptance is not necessary. Bank of United States v. Dandridge, 12 Wheat. 70.
*478 To return then to the construction of these acts. In tne preamble of the first act it is recited, that the erecting of a bridge over Charles river, in the place where the ferry between Boston and Charlestown was then kept, would be of great public utility, and that Thomas Russell esquire and others had petitioned the court for an act of incorporation to empower them to build said bridge. In the enacting part of the 'act the petitioners are accordingly incorporated, and a toll is granted and established for the purpose of reimbursing the corporation for the expenses of building and supporting the bridge. This grant of toll, taken in connexion with the preamble, without doubt authorized the corporation to erect a bridge at the place designated. And this certainly is all that is expressly granted by the act of incorporation. But the plaintiffs’ counsel contend, that from the nature of the grant, there was an implied covenant on the part of the government, that it would do nothing whereby any of the travel over the plaintiffs’ bridge should be diverted ; or at least, that it should not be done without compensation. I cannot, however, perceive any thing in the nature or language of the grant, or in the existing circumstances at the time of the grant, from which such a covenant can be implied. On the contrary all that appears tends to repel such an implication. This claim of an exclusive right was first advanced by the plaintiffs at the time when the proprietors of West Boston bridge were incorporated, and was repelled by the committee to whom the subject was referred ; and the report of the committee was sanctioned by the legislature. The additional grant was then made to the plaintiffs, which was considered by the legislature as a donation for the encouragement of enterprise ; and it is so expressed in the grant. It is clear, therefore, that the legislature did not intend to grant the exclusive privilege now claimed, and it is equally clear that this was known by the plaintiffs. They were at liberty to accept or reject the grant at their option, but when they accepted it, they must be considered as tacitly agreeing to the terms upon which it was offered. If then there were any doubts as to the construction of the first grant, which however I cannot perceive, there is none, as it seems to me, in relation to the additional grant, upon which alone the plaintiffs must rest their *479 claim ; the first grant, having expired by its own limitation; .before the erection of the bridge complained of. The intention of the legislature in making this latter grant is clear and manifest ; and to imply a covenant on their part in direct opposition to their declared intention, would be to make rather than to expound a contract.
The next question to be considered is, whether there is, m the grant to the defendants, any thing inconsistent with the prior grants to the plaintiffs : or whether the proceedings of the defendants, sanctioned as they are by the authority of the legislatuie, can be justified.
1. It is first objected, that this grant to the defendants is inconsistent with the tenth article of the declaration of rights ; and several cases have been cited in support of this objection. The principal one is that of Gardner v. The Village of Newburgh, 2 Johns. Ch. R. 162. In that case the defendants had diverted the water of a stream flowing through and over the plaintiff’s land, being authorized so to do by an act of the legislature, in which there was no provision for compensation to the plaintiff, and it was decided that the act, for that defect, was not binding. But the grounds upon which that case was decided, wholly fail in the case under consideration. The chancellor says, “that a right to a stream of water is as sacred as a right to the soil over which it Sows. It is a part of the freehold, of which no man can be disseised but by lawful judgment of his peers or by due process of law.” And on this principle that case was decided ; a principle upon which the present case certainly cannot be maintained. For if the tolls taken by the defendants at their bridge were a part of the plaintiffs’ freehold, then there is provision made in the defendants’ charter for compensation to the plaintiffs, and they have no cause for complaint. But it cannot be maintained, that these tolls were ever a part of the plaintiffs’ freehold, because it is clear, I think, that they never had any vested property in them. They had a vested property in their franchise, but not in the tolls, the fruits Of their franchise, until they were actually received. If any one should be forcibly prevented from passing over the plaintiffs’ bridge, it would be an injury for which an action on the case would lie, but not an action of trespass for taking or de *480 straying their property. It would be like the case stated in the books, where one has a market and a toll, and another is coming with goods to the market, for which, if sold, toll would be due, and a third person hinders him from coming to the market ; an action will lie for the lord of the market, on account of the possibility of damages. So it is laid down, that the stopping of beasts on their way to a market, to prevent their going there, is an act directly injurious to the owner’s franchise ; but he had no property in the beasts. It is said however, that if the stopping had not been eo intuitu, no action would have lain. Tewkesbury v. Diston, 6 East, 457.
So in the present case, the plaintiffs had no vested property in the tolls taken at the defendants’ bridge, and therefore whatever damages the plaintiffs suffered by the diversion of travel from their bridge, the damages were consequential ; and it was clearly settled in the cases of Thurston v. Hancock, 12 Mass. R. 220, and Callender v. Marsh, 1 Pick. 418, that consequential damage to property was not within the 10th article of the declaration of rights. In the latter case the plaintiff had sustained heavy damages by the alteration of an adjoining street; his use and enjoyment of his house had thereby been greatly impaired ; yet, though that was a hard case, the Court held that the damages were consequential; and that such damages to property did not amount to taking it, so as to entitle the owner to compensation. The same principle is applicable to the present case. The plaintiffs’ franchise has not been taken and appropriated to public uses, though to a certain extent they have been deprived of the beneficial use of it by the erection of the defendants’ bridge. It is true a different doctrine is intimated in the case of Chadwick v. The Proprietors of Haverhill Bridge, as reported by Dane, vol. 2, c. 67, art. 4, § 3. But this case was not decided by the Court, but by referees, and it does not appear that any objection was made to their report. And besides, provision was made in the defendants’ charter for compensation to the owner of the ferry, so that the only questions in that case were as to the amount of-compensation, and by whom it should be ascertained.
This objection therefore cannot be maintained on authority, and .certainly it seems to me it cannot on principle, unless tolls *481 and profits in expectancy can be considered as property within the meaning of the constitution. If such a doctrine can be maintained, that it must be admitted that the whole course of legislation m this and other States has been erroneous. Not only the acts authorizing the erection of West Boston bridge, the Canal bridge, and the Western avenue, are unconstitutional and void acts ; but the acts establishing the Newburyport turnpike, and several other turnpikes, which divert travel from the plaintiffs’ bridge, are all violations of their constitutional rights.
If the diverting of travel from the plaintiffs’ bridge is taking their property, for which they are entitled to compensation by the constitution, then any change of roads or any other act, which would divert a single traveller, would be unconstitutional, except it xvas founded on the basis of compensation. If so, there is not a turnpike road in this or in any other State, which can be supported ; for in none of the acts of this description has there been any provision for compensation for damages arising from diverting the travel from existing roads. And it appears to me, that a trader or innholder has as good a right to be protected in the enjoyment of the profits of his store or inn, as the plaintiffs have to be protected in the enjoyment of their tolls. But these are all cases of consequential damages, for which the law provides no compensation ; and the plaintiffs’ ease cannot, I think, be placed on any other or better footing.
The next question to be considered is, whether the grant to the defendants is void, as being in contravention of the constitution of the United States.
This question depends altogether on the construction of the plaintiffs’ grant, and I have already anticipated almost every remark I proposed to make on this point. Without doubt the grant to the plaintiffs was a valid contract; and if the construction given to it by the plaintiffs’ counsel is the true construction, then I admit that the obligation of it is impaired by the defendants’ grant. But for the reasons already given, I do not feel at liberty to adopt this construction. For if I were rather inclined to think it correct, still, if it were a doubtful matter, I should consider myself bound to reject it. Nothing but the clearest conviction of my own mind would induce me to declare *482 the act of the legislature unconstitutional; and although I do not question the power of the Court to make such a declaration, yet it never should be made but in cases which are clear and manifest to all intelligent minds. The acts of the legislature must be presumed to be constitutional, unless the contrary can be made very clearly to appear. Now the construction con tended for by the plaintiffs’ counsel is very far from being thus clear ; on the contrary, I can find nothing in the case to support it. I do not rest my opinion on this point wholly on the rule, that legislative grants or donations are to be construed favorably for the public interest ; for upon no rule of construction can the covenant set up by the plaintiffs be implied. All grants are to be construed according to the intention of the parties ; and the intention of this case appears to me very clear. When the plaintiffs first advanced their present claim, it was rejected by the legislature. This claim was then founded on the first grant, and it was then that the grant under which the plaintiffs now claim was made. It was then known to the plaintiffs, that the legislature did not intend to grant the exclusive privileges now set up ; and they must be presumed to have accepted' the grant upon the terms offered. If these teims had not been satisfactory, they should have rejected the additional grant, and vindicated their rights at that time. But they acquiesced, and afterwards, when the legislature approached them much nearer by the grant of the Canal bridge, they still acquiesced ; so that the intention of the parties appears as clearly, as if it were expressly declared in the words of the grant. The construction therefore now contended for is opposed to the understanding of the parties at the time of the grant; and it is unreasonable, if adopted without qualification, as being opposed also to the public interest. For if the legislature were bound for seventy years, so that they could not provide for the public accommodation, without making compensation to the plaintiffs, the public might materially suffer, and the grant would partake too much of the nature of a monopoly.
Suppose the government, at the time of the grant, had a large establishment in Charlestown, occasioning much travel between that place and the capital, could it not be discontinued *483 without compensation to the plaintiffs ? or suppose some of the roads leading to the plaintiffs’ bridge at the time of the grant, could afterwards be turned in another direction, to the great accommodation of the public travel (as they in fact have been), could they not be so turned, or new roads opened, without infringing the plaintiffs’ rights ? It seems to me extravagant to hold that they could not; yet this is the necessary consequence of the principle now contended for. And tlus restraint is to be imposed on the legislature, not from any words in the grant manifesting their intention thus to bind themselves, but expressly against their declared intention at the time of the grant. Now the reverse of this, I think, is implied in the terms of the grant ; the public accommodation was the declared object of the grant; it may therefore be implied very fairly, that the public were at all events to be accommodated ; and if, from the increase of population or business, additional accommodation should become necessary, it was to be sup plied.
This rule of construction is fully supported by the cases of Prince v. Lewis, 5 Barn. & Cressw. 363, and of Mosley v. Walker, 7 Barn. & Cressw. 54. In the former case the plaintiff had a grant of a market for the sale of fruits, vegetables, &c. within specified limits, and the complaint was, that the defendant had sold fruits &c. in the neighbourhood of the market. The plaintiff recovered a verdict, but the court held, that the action would not lie, it appearing that there was not sufficient accommodation for the public in the market, a part of the space having been diverted to other purposes. In the case of Mosley v. Walker, Bayley J says, “ I take it to be implied in the terms in which a market is granted, that the grantee, if he confine it to particular parts of the town, shall fix it in such parts as will yield to the public reasonable accommodation ; in order that the market, which was originally granted for the benefit of the public, as well as for the benefit of the grantee, may be effectually held.”
It was upon this principle that the legislature proceeded, in authorizing the erection of the defendants’ bridge, having decided, upon a full hearing of all parties interested, that public necessity and convenience required the additional ae *484 commodation prayed for ; and on this point their decision is i • conclusive.
It is true the plaintiffs offered to provide the most ample • * accommodation, by constructing a circular draw, and a spur bridge on the Boston side of the river, to facilitate travel to and from the westerly part of Boston, and even to erect a new bridge. But however reasonable this offer appears to be, (and I confess that to me it appears exceedingly reasonable,) yet I take it the legislature were the exclusive judges on this point also. They were not compellable to enter into a new contract, or to enlarge or modify their former grant. They were to determine whether the public were or were not sufficiently accommodated ; and if they were not, in what manner, and by whom, the additional accommodation should be supplied. The Court have no right to inquire into these matters, and we cannot know judicially to what extent the public were incommoded, and how pressing was the necessity for a new bridge ; so that unless we determine that no inconvenience, however great, xvould authorize the legislature to interpose as they did, we cannot impeach their grant to the defendants as an unconstitutional act.
The view I have thus taken of this part of the case does not appear to me inconsistent with the current of the authorities cited by the plaintiffs’ counsel in support of their exclusive claims. Most of the cases relate to ancient rights to ferries and markets, founded on titles by prescription. Now when a party can show that he has claimed and enjoyed an exclusive privilege from time immemorial, a grant in his favor will be presumed co-extensive with the enjoyment. These cases therefore will furnish no rule of construction as to actual grants, which are to be interpreted according to the terms of them. But even in some of the cases founded on prescriptive titles, the parties were not allowed unlimited exclusive privileges, allhough they had been enjoyed from time immemorial. They were restrained in favor of the public interest and convenience. In the case cited from Hardres, a new ferry was set up at the distance of three quarters of a mile from an ancient ferry, and it was held that it was no injury to the lawful rights of the owner of the ancient ferry In the case of Tripp v. Frank, *485 4 T. R. 666, the plaintiff proved a title by prescription to a ferry from Kingston upon Hull to Barton, and that the defendants had at different times carried over persons from Kingston upon Hull to Barrow, two miles below Barton. A verdict was returned for the plaintiff, but the court held that the action could not be maintained ; yet it is obvious that the plaintiff nad suffered by the diminution of his tolls ; but it was damnum absque injuria. The court remark, “ that it is absurd to say that no person shall be permitted to go to another place on the Humber than that to which the plaintiff chooses to carry him.”
The decisions in these cases and in the cases of Prince v. Lewis, and Mosley v. Walker, before referred to, are, in my opinion, fully supported by well established principles, and are strongly opposed to the whole doctrine on which the plaintiffs rest their case.
Upon the whole, I am of opinion that the grant to the defendants is a valid grant, and that the acts and proceedings under it are no infringements of the plaintiffs’ rights ; it having been decided by competent authority, that the erection of a new bridge was required by public convenience and necessity.
I am aware of the hardship of the case in relation to some of the plaintiffs ; and I am, I trust, fully sensible of the importance of preserving public faith, and protecting private property ; but the public interest, accommodation and convenience, are likewise to be guarded ; and we must respect the constitutional rights and powers of the legislature, preserving also a reasonable confidence in their wisdom and integrity. Their doings are not to be set aside, unless it can be made clearly to appear that they have exceeded their constitutional powers.
For these reasons I am of opinion that the plaintiffs are not entitled to the relief prayed for, and that the bill should be dismissed.
Putnam J.
It is admitted that the act of March 9, 1785, (St. 1784, c. 53,) granting to Thomas Russell and others a right to build a bridge over Charles river, and to have the toll for forty years,' and the act of March 9, 1792, (St. 1791, c. 62,) extending the term for taking toll to seventy years, are to be considered as contracts, within the meaning of the constitution of the United States.
*486 The act for the incorporation of the proprietors of the Wairen bridge, (St. 1827, c. 127,) was passed on the 12th of March, 1828.
The general questions for consideration are, whether the last act impaired the contracts first mentioned, and so was contrary to the constitution of the United States : and whether it was an appropriation of private property for public uses against the consent of the owners and without compensation, and so was contrary to the constitution of Massachusetts.
I think that both questions should be determined in the affir mative.
I propose to maintain, 1. That the President and Fellows of Harvard College, on the 9th of March, 1785, were seised in fee of the franchise' of the ferry between Charlestown and Boston, under the grants of the colonial government.
2. That the college, for valuable consideration paid by Mr Russell and his associates, consented that they should have the ferry during the continuance of their charter.
3. That no other ferry could be lawfully erected by the State, or by individuals, so near to the old ferry as to impair its profits or draw away its custom.
4. That the plaintiffs, having acquired the right of the col lege as above mentioned, did, in virtue of the charter granted to them by the legislature, become seised of an exclusive franchise, which was as extensive as the owners of the ferry had enjoyed, for the transportation over Charles River, between Boston and Charlestown, over their bridge ; so that a new ferry or bridge, which would have been a nuisance to the old ferry, would also be a nuisance to the old bridge.
5. That if the charter to the plaintiffs, to erect a toll-bridge, is to be construed without reference to the ferry, it would be a grant of an exclusive privilege or right to have toll for transportation, as extensive as if it had been a grant of a ferry : and also, that it contained an implied covenant or engagement on the part of the State, not to grant another bridge so near as to draw away the toll from the old one.
6. I shall consider the operation of the new bridge upon the old one, and draw the consequences which I think the constitution requires, upon the whole matter.
*487 I extend to the legislature all the respect which should be required from a member of the judicial department. Their acts are presumed to have proceeded from good motives, and a sense of duty imposed by the constitution and the laws But in speaking of an act which I disapprove, I cannot use words of commendation. I desire it to be understood however, that the opinion I am now to pronounce, is formed with all proper deference for a co-ordinate department of the government.
1. In the first place I am to show that the college owned the ferry.
It appears that m 1640 the general court granted the jerry between Boston and Charlestown to the college. It was objected that this grant was made before the college was incorporated, and so was void for the want of a party legally authorized to take and hold as a grantee. If that were so, it would not diminish the liberal intention of the grantor or donor, and would aid in the construction of the subsequent grants to that deservedly favored institution. It was incorporated in 1650. And in that year the general court ordered, that the president, in behalf and behoof of the college, might dispose of the Charlestown ferry by lease or otherwise, making the best and most advantage thereof to his own content. In the same ordinance the ferry-rent is spoken of as belonging to the college. Four years afterwards the general court speak of “ the profit of the ferry, formerly granted to the college, which shall be continued.” And in 9 Anne, when a complaint was made of neglect of due attendance at the ferry, an act passed, reciting, “ that the treasurer of the college had attended," and that “ the profits and revenues of the ferry had been granted to Harvard College in Cambridge,” and “ they had seen the lease made by him of the ferry for several years yet to come.” In this connexion, considering that the State had for one hundred and forty-five years permitted the college, under these grants, original and confirmatory, to take the profits for their own use, it cannot (as it seems to me) be doubted, that the college was seised of the franchise as of fee when the act of 1784 was passed.
It was contended, however, that notwithstanding the grant ol *488 1640, the general court, in 1644, exempted the magistrates from the payment of ferriage, which would be an act implying • a right to the franchise itself. But the exception in the ordinance carries an answer to the argument. The magistrates were not to pay, “ except at such femes as were appropriated to any or rented out, and were out of the country’s hands.” In such cases the country (or general court) were to pay for them. That was exactly the case in regard to Charlestown ferry. It was appropriated to the use of the college ; it was out of the country’s hands, and in the hands of the college. The magistrates were to pass without paying the ferriage themselves, but the government were to pay it for them.
Upon this part of the case it seems to me very clear, that the State had made a permanent grant of the franchise to the college for the furtherance of good learning. It was a wise and munificent exercise of their power. The grants were ac cepted, and the duties which they imposed were performed by the college
2. The college, for valuable consideration paid by Mr. Russell and his associates, consented that they should have the ferry during the continuance of their charter.
This fact is proved by circumstances which could not have taken place, unless such consent had been given. The plaintiffs built their bridge over the ferry-ways, and ever since they have continued to pay to the college 200Z. a year for their right The college discontinued their boats, and the plaintiffs have taken the toll for transportation. The college have received the annuity, in lieu of the tolls which they had before received for their own use for nearly a century and an half. Surely the college could not maintain an action against the proprietors of Charles River bridge for a disturbance of their ferry, because the jury would be bound, from these facts, to find that they had consented that the plaintiffs should have it during their charter. 2 Wms. Saund. 175 b. The assent of the college, whether it be in the nature of a grant, discontinuance, surrender, lease or license to use the franchise of the ferry, should be construed to enure in the most beneficial manner for the plaintiffs, who paid a valuable consideration for it. The legislature recognise the *489 agreement in the charter to the plaintiffs. The plaintiffs were grantees, or, at least, licensees of the college.
3. I now propose to show, that no other ferry could be lawfully erected by the State, or by individuals, so near to the old ferry, as to draw away its custom.
This involves the consideration of the rights which belong to a ferry. How far on each side does the franchise extend ?
On the part of the defendants it is contended, that the right is confined to the ferry-ways on each side. And we are referred to Sav. 14, for the authority to support that position. It is said, that a ferry is in respect of the landing-place, and not of the water ; the water may be in one, the ferry in another, and in every ferry the land on both sides of the water ought to be in the owner of the ferry ; otherwise he cannot land on the other part. 13 Vin. 208, tit. Ferry, Ipswich v. Brown. The last sentence is explanatory of the case. The matter under consideration was not how far on each side the franchise extended ; the point of the decision was, that there must be a right of landing necessarily included in the franchise, or it would not come within the description of a ferry. In Com. Dig. Piscary, B, the case is stated thus : —C£ He who has the privilege of a ferry, ought to have the soil on both sides of the water, for he cannot land upon the soil of another without his assent.” Now that seems to be an obvious truth. There must be a right of landing. It is not necessary however that the owner of a ferry should have a fee simple in the soil. A permission or license of the owner to land would be sufficient The King v. Nicholson, 12 East, 333.* But there is no legal ground to maintain that the extent of the franchise is to be limited to the ferry-ways.
The law xvas clearly held otherwise in England for centuries before the settlement of this country. It was brought hither *490 by our fathers, and has been recognised by the eminent jurists of our own country. I deem it important to demonstrate this part of the case, and shall therefore make free citations from the books to prove it.
It is said by Paston J. in 22 H. 6. 14. pi. 23, that “ if I have an ancient ferry in a ville, and another sets up another ferry upon the same river near to my ferry, so that the profits of my ferry are impaired, I shall have an action of the case; against him,” And the reason is given by Neioton, — “ for you are bound to sustain the ferry, and serve and repair it for the use of the people, under penalty of grievous amercement.” S. C 16 Vin. 30, tit. Nusance, H. pi. 25 ; S. C. 2 Roll. Abr. 140, tit. Nusance, pi. 4 : where the second ferry is called a. nuisance to the first.
Bac. Prerogative, FI. “If the king grants a fair or market to one person and afterwards grants another to another person to the prejudice of the first, the second grant is void.” The king will permit the party aggrieved as a matter of right, to use his name for the repeal of the second grant, which was prejudicial to the first. Sir Oliver Butler’s Case, 2 Ventr. 344; S. C. 3 Lev. 221; Brewster v. Weld, 6 Mod. 229. Same law in 3 Bl. Com. 218. That distinguished commentator expresses himself thus ; — “ If a ferry is erected on a river, so near to another ancient ferry as to draw away its custom, it is a nuisance to the owner of the old one.” Same law, Ficzh N. B. 184, note a; Bull N. P. 76 ; $. P. Lord Hale’s Treatise, Be Portibus Maris, c. 5, p. 59.
Blissett v. Hart, Willes, 512, was an action of the case by the owner of an ancient ferry, against one who had set up another near. It is there laid down, that the owner may have
his remedy for the injury by an assise of nuisance, or an action upon the case. It is a franchise which cannot be erected without license from the crown, and when one is erected, another cannot be erected without a writ of ad quod damnum.
16 Vin. 26, tit. Nusance, G. pi. 2. But if such grant should be made without that clause, and it should be found
to the damage of the king or of the subject, it shall be avoided.
We have no process of ad quod damnum, but it is be *491 iieved that the constitutional provisions and the principles of the common law, afford protection to the property of the people here, equivalent to that which is given by the writ of ad quod damnum in England.
A ferry, says Mr. Dane, vol. 2, p. 683, “ forms a part of a public passage or highway, wherever rivers or waters are to be passed in boats. They therefore, who have a ferry, must be bound in a proper manner to keep it up ; to have suitable ferry-ways, boats and attendants, at all seasonable times. The natural consequence of this duty, enjoined by law, is, that the keepers of the ferry must have a reasonable compensation for their time and expenses, fixed by law, and legally secured to them. In this way, a ferry becomes property, an incorporeal hereditament, the owners of which, for the public convenience, being obliged by law to perform certain public services, must, as a reasonable equivalent, be protected in this property.”
The owner may prove his title by grant, or by prescription, which supposes such a grant to be made.
The case of Chadwick v. Proprietors of Haverhill Bridge was settled upon these principles. It was decided in this Court in 1798. 2 Dane, 686. The plaintiff declared in an action
upon the case against the defendants, for destroying his ferry by the building of a bridge near to and within forty rods of his ferry. The defendants justified under an act of the legislature authorizing them to build the bridge ; and this Court was of opinion, “ that the act did not, and perhaps could not, deprive the plaintiff of his common law right to try his title and damages by a jury in a civil action. How could the Court have otherwise determined, without disregarding the provisions of the constitution, which declares that the trial by jury shall he held sacred ?
I have examined the record and papers in that case. The declaration was drawn by Parsons. The original remains on file in his handwriting. I mention this circumstance to show that it was a case which received his particular attention. It states, “ that the plaintiff, on the 1st August, 1794, and long oefore, was and ever since has been, and now is seised in his own demesne as of fee and right, of and in a certain ferry over Merrimac river, known by the name of Chadwick’s fer *492 ry, for the transportation in boats, of persons, carriages and beasts from Bradford to Haverhill, and from Haverhill to Bradford, with a right to receive toll for the said transportation ; yet the proprietors, not ignorant, &c. but intending to injure the said Chadwick in the enjoyment of his said franchise and deprive him of the toll and profits accruing therefrom, on the 1st of August aforesaid, erected a bridge over the said river, near to and within forty rods of the said Chadwick’s ferry aforesaid, extending from Bradford to Haverhill, from the banks cf said river in Bradford aforesaid, and over the said river to the banks thereof in Haverhill, for the passage of any persons, their carriages and beasts, from Bradford to Haverhill, and from Haverhill to Bradford, for a toll to be paid to the said proprietors for such passage, and the said bridge have kept up from that time to the present time, and during the same time have permitted sundry persons, with their carriages and beasts, to pass the same bridge, and have received divers sums of money as toll therefor, to the great prejudice and detriment of the said Chadwick, and the said Chadwick hath tnereby lost, during the time aforesaid, all toll and profit arising from his said ferry.”
The plaintiff in that case proved a prescriptive right to the ferry. The depositions are on file. In June term, 1797, the action was referred specially. Mr. Dane (the venerable author of the Abridgment of American Law, who was then in full practice at the Essex bar) was the chairman of the referees. The rule was drawn up by Sullivan (who was attorney-generai and of counsel for the proprietors), and amended by Parsons, and signed by both, giving the referees authority to find a sum m gross for the damages, if they should find that the plaintiff had a right to recover. The award, dated November 14, 1798, is in the handwriting of Mr. Dane, in which the referees say that they, “ having found that the said Chadwick bad a right to recover damages, do report that he recover 1110 dollars, being a sum in gross,” &c. Chief Justice Francis Dana was present with the whole Court, when the report was accepted. His associates were Paine, Bradbury, Cushing and Dawes.
The act of incorporation of the proprietors of Haverhill bridge, passed March S3, 1793, (Special Laws, vol. 1, p *493 437,) provided that within one year after the bridge should be ■ouened for passengers, the proprietors should pay Samuel Chadwick such sum. or sums of money as should be awarded to him by three indifferent men mutually chosen by the parties, as a full compensation for any injury sustained by him by the erecting said bridge ; and in case of the refusal of either of the parties to appoint such referees, the judges of the Court of Common Pleas for the county of Essex should ascertain and adjudge said compensation, after due notice to all concerned. But Chadwick did not choose to abide by that mode of compensation, and commenced his action at law ; and the Court held, that the act of the legislature did ,not take away his right to a trial by jury.
I consider this to be a case of great importance, notwithstanding the judgment was rendered upon a report of referees. It came under the consideration of a court very learned, especially in the common law. The most eminent counsel were engaged on each side. The defendants were a powerful corporation, claiming, but finding no shelter, under an act of the legislature, which had taken the property of the plaintiff for public uses, without providing for him a constitutional trial by jury. I do not question the right of parties to submit the law as well as the fact to arbitrators, who, being judges of the parties’ own choosing, have power to decide definitively. But this was no ordinary case or arbitration. It must have been broken before the Court, or they would not have expressed the opinion which they did. It may not, under the circumstances, be considered as binding upon the Court. But if it is considered merely as the award of the American Coke, upon a question of legal right, it is to be treated with great respect. Mr. Dane (ubi sup.), says that they reported for the plaintiff, on the ground that he had such a right in the ferry as he had declared for.
I hold it upon the authorities of the law to be clear, that the franchise of a ferry is not confined to the ferry-ways, but that it has an exclusive right of transportation of such extent on each side, as to prevent near and injurious competition. If, therefore, the Charlestown ferry had been continued, and the owners of it had sued the proprietors of Warren bridge, the *494 case would be like the case of Chadwick v. Proprietors of Haverhill Bridge, with this exception, that Chadwick’s ferry was not so near to Haverhill bridge, as the Warren bridge is to the Charlestown ferry-ways. If a new ferry had been set up where the Warren bridge is, it would in legal contemplation be clearly a nuisance to the old ferry.
4. I proceed to show that the plaintiffs, having acquired the rights of the college as aforesaid, did, in virtue of the charter made to them, become seised of a franchise to have the toll for transportation over their bridge, as extensive as the college had enjoyed for the transportation in boats.
This contract must be construed according to the intent of the parties, u as it may be inferred from the whole expressions and the nature of the occasion to which it is applied.” 1 Evans’s Both. 59, in notis.
The act or contract is very inartificially drawn. It contains no express enacting clause authorizing Mr. Russell and his associates to build the bridge, and their right to do so is to be inferred only by implication. And if the doctrine is correct, that nothing is to be taken by implication in the grants of the State, as it has been said in regard to the grants of the king, the proprietors could not defend themselves against an indictment for nuisance.
Thus m a case cited by the defendants from Davies, 157, it was agreed, that where the king granted to Sir Randall M^Donell all the territory adjoining to the river Banne, and all fisheries within that territory, “ exceptis tribus partibus piscaría de Banne,” that the fourth part of this fishery should not pass by the grant; for (say the court) “ the king’s grant shall pass nothing by implication.”
My brethren, I believe, are not prepared to adopt that position. It must follow from the rejection of it, that the king’s grants, or grants of the State, are to be construed with all such implications as are necessary to carry their manifest intent into effect.
I hold, that even in the construction of the king’s grant, the rule, id cerium est quod certum reddi potest, applies as much as it does in the grants of individuals. And that where the king grants for a valuable consideration, it is to be construed more *495 favorably for the patentee, than for the king. I suppose it will not be contended that the grants of the legislature are to be construed more favorably for the grantor, than the grants of the king would be.
In The Lord Chandos’s Case, 6 Co. 55, it was held, that although the king hath mistaken the law or the fact, in case the same were no part of the consideration, the grant shall not be avoided, because the party was in no fault. By a grant of the manor, without a word of the reversion, the reversion shall pass, although the king grants it as in possession.
Again, in Whistler’s Case, 10 Co. 65 ; “ such construction as will make the true intention of the king expressed in his charter take effect, is for the king’s honor, and stands with the rules of law.”
17 Vin. 153, tit. Prerogative, O. c, pl. 1. If two constructions be made, one to make the grant void, and the other good, then for the honor of the king and the benefit of the subject, such construction shall be made that the grant shall be good.
Again, in JWolyn’s Case, 6 Co. 6, the rule is mentioned, “ to construe the king’s grant beneficially for his honor and the relief of the subject, and not to make any strict or literal construction in subversion of such grants.”
Vin. (ubi sup.) pi. 4, referring to 2 Inst. 496. The king’s patents for liberties, lands, SfC. shall have no strict or narrow interpretation for the overthrowing of them, but secundum ea rundem plenitudinem judicentur, viz. to have a liberal and favorable construction for the making of them available in law, usque ad plenitudinem, for the honor of the king, viz. as fully and beneficially as the law was taken at the time when they were made.
The parliament of England, sensible of the great oppression which would fall upon the subjects, by a narrow construction of the grants of the sovereign, in the time of Queen Elizabeth (43 Eliz. 1,) enacted, “ that letters patents of all grants made by the queen, should be expounded most beneficially for the patentees, any mis-naming, mis-recital, or non-recital notwithstanding.”
Vin. (ubi sup.) pi. 13. “ The construction made on grants *496 of the crown is, that where the intention is plain, the words are taken most favorably for the subject.”
Com. Dig. Grant, G 5. “ If the king’s grant refers to another thing which is certain, it is sufficient; for id certum cst, &c. though the reference be to a matter in pais.’’’
In Plowd. 13. “If the king grants all such lands as came to him by attainder, this grant comprehends no certainty; yet it was held good, because by circumstances it may be reduced to a certainty.” And it is said that the “ same law is in cases of common persons.” So in p. 12. “ If the king grants over certain lands which came to his hands before, and further grants to the grantee such liberties, privileges, &c. as he had who was last seised of the lands, where the king knows not the certainty of the liberties and privileges, yet this grant is good enough, and the patentee may inquire what liberties and privileges the other had before, and the same he shall use and enjoy, and yet they were not certainly expressed, but were incertain at the time of the grant: But for as much as this incertainty may be reduced to a certainty by inquiry, or other circumstances, the grant is good.”
Bac. Abr. Prerog. F 2. “ If the king’s grant may be taken to two intents, one of which may be good and the other not, it shall be construed to such intent that the grant may take effect.”
Bac. Prerog. F 2. “ When the king’s grants are upon a valuable consideration, they shall be construed favorably for the patentee for the honor of the king.”
17 Vin. 152, Prerog„ M. c, pi. 11. The service done to the realm is as good a consideration as if 500Z. had been given for the land. Per the Lord Chancellor.
I will now proceed to inquire as to the facts and circumstances which attended the making of the grant or act of 1784.
The only communication with Boston was by the Charles-town and the Winnesimmet ferries, excepting the communication by Roxbury. Mr. Russell and his associates, in their petition to the legislature, explain their expectations if their petition should be granted. After speaking of the inconveniences of the transportation in boats, they say, that it had long been tne wish of many to see a bridge erected across Charles river, *497 ai the place where the ferry between Boston and Charlestown was then kept. They take into consideration the great advantage which will arise, not only to the towns of Boston and Charlestown, but to all the country “ to the westward, northward, and eastward, by the accomplishment of so desirable an object ” And they were willing, if suitable encouragement should be given to them, to undertake the work at their own cost and charge, though the expense would be great. In other words, they propose to accommodate all who come from the west, from the north and from the east, with a bridge, being satisfied that the toll which such a travel would pay, would indemnify them for the hazard and expense. They expressly refer lo the ferry, and propose to put their bridge in its place, for the public accommodation, as well as for their own emolument. The legislature granted their petition. The act is an echo of it. It is entitled, “ An act for incorporating certain persons for the purpose of building a bridge over Charles river, Detween Boston and Charlestown, and supporting the same during the term of forty years.” Then they recite, that whereas the erecting of a bridge over Charles river, in the place where the ferry was then kept, &c. They proceed to make the petitioners a corporation and to grant a toll for the sole benefit of the proprietors of the bridge for forty years, commencing on the day when the bridge should be opened for passengers.
Various rights and interests were to be provided for, before the project of the petitioners could be carried into effect. The President and Fellows of Harvard College were to be secured in the payment of the annuity for their right to the ferry, during the charter. The license of the government to obstruct, in some degree, the navigable waters, by the piers of the bridge, was to be obtained. The public accommodation was to be provided for by a bridge of such ample dimensions as the legislature should prescribe. And lastly, the petitioners were to be remunerated by the toll for their great expenditure of money and labor upon a then untried and hazardous enterprise. And besides, the college was to be exempted from the duty of keeping up their boats, while the bridge should be passable. For they could not lav down, any more than they could set up a *498 ferry, without the consent of the legislature. Paine v. Partridge, 1 Salk. 12.
Now it is clear to my mind, that all these various rights and interests were intended to be provided for by the act of 1784. The State cannot be permitted to say, against the necessary inference of that act, that the petitioners were not licensed to build the bridge. They surely are not liable for a nuisance in the navigable waters of Charles river, nor could any indictment be maintained against the college for discontinuing their ferry under the agreement with the proprietors of the bridge. These were the expected consequences of the building of the bridge. And as little was it apprehended that the franchise in the bridge should be of less extent than the franchise of the ferry, to which all the parties concerned in the act referred.
This grant was for a valuable consideration, rendered to the public, and (as we have seen) is to be construed favorably for the grantee.
If the grant had been made directly to the college, could it be supposed that their franchise, or right to toll, had been lessened, because the mode of transportation had been changed ? Let us consider for a moment the nature of these franchises. They are included in the species of tolls, and among many (of which Lord Coke speaks in Webb’s Case, 8 Co. 92,) are pontage and passage. “ The latter,” he says, “ is properly a ferry for the passing of men and cattle over a water, for which the owner has a toll; the former is a toll for passage or carriage over a bridge.” $. P. 13 H. 4 14, and in the index to that vol. verb. Grant; 17 Yin. Abr. 88, Prerogative, M. b, pi. 18, 19; Heddy v. Welhouse, Moore, 474; Smith v. Sheperd, ibid. 574.
Now I think it was intended by all the parties named or concerned in the act of 1784, that the proprietors of the bridge should succeed the owners of the ferry, in the toll for the transportation of all which should come from the east, from the west and from the north to Charlestown, and go from thence to Boston, and back again. In other words, pontage was substituted for passage (or ferriage, as it is more frequently tailed), without any diminution of the extent of the franchise. It would seem therefore to follow, that a new ferry or bridge *499 which would have been a nuisance to the old ferry, would also be a nuisance to the bridge, which took the place of the old ferry.
I have dwelt much upon this part of the case, because I think it has a strong tendency to show what were the intentions of all .parties concerned or interested in the original contract or act of 1784.
It has been contended, that the right of the college in the ferry was surrendered to the State, and that it merged in the State, so that the grant of the charter for the bridge should be considered as altogether independent of the ferry, which had thus become extinct.
I have two answers to that argument. In the first place, that the right to the ferry did not merge in the State ; and secondly, if it did, it does not affect the question, because a grant may refer to a thing, or to rights, privileges or liberties, which once existed, by inquiries, even in pais, just as well as it may to things, rights, &c. in existence.
As to the first point, it would seem to be a violent construction of the act of 1784, and of the circumstances which accompanied it, to make it a surrender of the ferry to the State. I admit that it was surrendered either to the State or to the proprietors of the bridge during its charter. If to the State, it was without consideration ; if to the proprietors of the bridge, it was upon valuable consideration. Now I cannot but think it is more consonant to law and reason, that the party which paid the value, should have the right, than the party which paid nothing at all.
Suppose the ice and the tides should have carried away the bridge the next winter after it was completed ; the proprietors would have had a right to continue the ferry during their term, and take the tolls, for they were liable to pay the annuity to the college during that time. And if at the end of the term, there should be no bridge remaining, the college would have the ferry, without a new grant from the State. The college had in effect surrendered or leased it to the proprietors during the charter of the bridge. They have never parted with their reversionary interest.
But secondly, if it did merge in the State, it would not *500 affect my argument. It once existed, and as a matter of *efer ence, to explain the meaning of the contract of 1785, it would have been just as good if it were merged, as if it were leased only for a term of years to come.
For example. On the 23d of November, 1637, the general court “ leased to Edward Converse the ferry between Boston and Charlestown, to have the sole transporting of passengers and cattle from one side to the other for three yeau.” Now suppose the State, after the expiration of the lease, should have granted a toll bridge to be placed where the ferry was kept by Edward Converse, while he was lessee of the State, with all the privileges in that lease contained; I think that lease would be taken into consideration, in ascertaining the privileges granted to the proprietors of the bridge, notwithstanding it had expired according to its own limitation.
It is said by Popham C. J., Cro. Eliz. 591, that where one hath a grant by prescription, whereto a toll hath usually been paid, which is afterwards forfeited to the king, and the king grants it cum omnibus libertatibus ad feriam spectantibus, by this grant the grantee shall have the toll, for toll was formerly belonging thereto ; and therefore the king did not grant a new fair, but the ancient one.
In the case of the Abbot of Strata Marcella, 9 Co. 30 ; “ When a charter has general reference to other charters, it is as much in law as if all the charters had been recited.”
5. But I maintain, that if the charter to the plaintiffs to build a toll bridge, is to be construed without reference to the ferry, it contains a grant of an exclusive privilege or right to have toll for transportation, as extensive as if it had been a grant of a ferry ; and that it contained an implied covenant or undertaking, on the part of the State, not to grant another bridge so near as to draw away the custom from the old one.
I maintain that the franchise in a toll bridge is analogous to the franchise of a ferry, and is no more to be confined to the width of the bridge, than a ferry is to be confined to its ways. I ask for a reason, why a different legal rule is to be applied to the franchise in a toll bridge, from that which we have seen is applied to a franchise in a ferry. The franchise consists in the emoluments to be derived from transportation. It is not enough *501 to say that the one is by a bridge and the other is by a ferry. What reason can be given, why a man’s property in a ferry should be protected from near and injurious competition, and his property in a bridge should be exposed to the nearest invader ? I have heard none, and I think my learned brethren would have given one if there were a good one to give. They are both pvMici juris, and derivable from the grants of the State. Both are grounded upon tolls, for indemnity and income to the owners. The expenses of the bridge, and its accommodation of the public, are immensely greater than those of the ferry. They are protected precisely by the same legal principles. Badem est ratio, eadem est lex.
In Chadwick's Case, the bridge was just as much treated as a nuisance to his ferry, as if a new ferry had been set up where the bridge was placed. In its effect it was infinitely a greater injury. It destroyed the ferry. Why is it that a new bridge or new ferry is a nuisance to an old one ? Because it diverts the travel and transportation, and so deprives the ancient bridge or ferry of the toll which it would otherwise have received.
The defendants must maintain, that the extent of the franchise is confined to the width of the bridge. My learned brethren, from whom I am compelled to dissent, must come to that conclusion. I have demonstrated, if any proposition can be demonstrated, from the books of the law, that this limited 'construction is not to be applied to a ferry. I must admit, however, that if the extent of the franchise is so limited to the width of the bridge ; if that was the real intent and meaning of the legislature and of the grantees ; it would follow that the plaintiffs have no claim ; their property has not been taken, the constitution has not been violated, and all the general principles to which I have adverted are misapplied. I believe my learned brethren who would maintain that the right is confined to the width of the bridge, do not consider that as a very clear proposition. The case certainly admits (to say no more of it) of another and enlarged construction. Upon this point then I refer again to the rules applicable to the construction of grants of the king. “ If two constructions may be made, one to make the grant good, the other to make it void, then for the honor of the king and the benefit of the subject, such construc *502 tion shall he made that the grant shall he good.” The court are “ to construe the king’s grant most beneficially for the honor of the king, and for the relief of the subject, and not to make any strict or literal construction in subversion thereof.” Now if the case be tried upon those principles, how will it stand ?
The legislature, for a valuable consideration received by the public, in the bridge erected at immense expense and risk, grant to the meritorious and enterprising proprietors a toll for their own use, first for forty, and then for thirty years more. But the State has a right indirectly to withdraw the transportation from it. Are these things consistent with the honor of the government and the safety of the people ?
It would be in vain to tell the proprietors that their franchise remained, notwithstanding a new bridge had been placed in ef feet side by side, which should deprive the old bridge of its emoluments. Suppose, for example, a free bridge should be so placed by the side of the toll bridge, — it would seem a mere mockery, to tell the proprietors that they might have all the toll which they could collect for ' the transportation over their bridge so long as their charter continued. The free bridge would as effectually destroy their franchise, as if an armed force were stationed to prevent any passing over it. Who does not see that their charter would be subverted by this construction ? All must admit the fact which would result.
But the maxims of the common law should be applied to this subject. One shall not do indirectly, what he has no right to do directly. Every grant shall carry with it all things which are necessary to the enjoyment of it. “ Quando aliquid prohibetur, prohibetur et omne per quod devenitur ad illud.'n “ Quando aliquid conceditur, conceditur et id per quod pervenitur ad illud.” “ The king (said the excellent and independent Chief Justice Gascoine) cannot, by his charter, oust the common people of their inheritance which they have in the common law.” 8 H. 4. 19.
It has not been contended that the legislature could, at their owm will, revoke or repeal their own grant. Notwithstanding this is obviously clear, yet I cannot deny myself the pleasure, of quoting a passage from an elaborate opinion for the whole
*503 court bv Stoiy J., upon this point, in Terrett v. Taylor, 9 Cranch, 52. u But (said the learned judge) that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the State, or dispose of the same to such purposes as they may please, without the consent or default of the corporators, we are not prepared to admit; and we tame ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and letter of the constitution of the United States, and upon the decisions of the most respectable judicial tribunals, in resisting such a doctrine.”
This is the doctrine of the common law expressed in the language of the time. “ If the king grant a ratification to an incumbent of a church, of which he has the right of presentment, and repeal this ratification, the revocation is void ; foi the king cannot (say the court 10 H. 4. pl. 10,) repeal that nor a grant of pardon, nor a release, et hujus modi.”
Now I maintain, that if the State could not directly repeal their grant, they could not do that which in its operation anc effect would be equivalent to a repeal of it. If this principle be not supported and followed out, we shall never have a rem edy for any violation of contracts, or of the constitution. We shall never see an act reciting, that whereas the legislature did grant three acres of land or a toll for forty years, be it hereby enacted that the grantees shall have only one acre of land, or toll for thirty, or any less number of years, No legislator would vote for a thing of such naked deformity. But if the construction of the charter under consideration be limited to the width of the bridge, and a free bridge should be set up side by side, the effect would be, to repeal all the beneficial interes. of the proprietors in their grant. Yet there would be no direct infringement of it in terms, for the free bridge which we have supposed, would not come so near as to touch the old one, out just near enough to draw away all the toll from k.
If it would not be lawful to grant a new free bridge, is it lawful to grant a new toll bridge, with similar or less toll, side by side of the old one ? What difference is there in the *504 principles of the law applicable to. the two supposed cases ? I think there is none. The only difference is in the amount of ■ injury which would be sustained from the free or from the toll bridge. The latter would take away perhaps three fourths or more of the franchise first granted, the former, the whole. As if it were lawful to impair the original grant to any extent short of its annihilation !
It has been suggested, but not much pressed, that the legislature has as much right to grant rival bridges, as they have to grant rival banks and insurance companies. But there is an obvious difference between these cases. Grants of banking and insurance corporations merely give an authority to manage their private concerns. A mere faculty or power of doing, in a corporate name, what they might at common law have lawfully done as individuals. But bridges and ferries are publici juris. A toll.is granted for a service rendered to the public. The bonus, which banks or insurance companies pay for their charters, does not make them matters in which the public have an interest. They may discontinue them and divide the stock just when they please, paying their debts. No individual can compel a bank to lend him money, or an insurance company, to write upon his ship, unless they please. But the proprietors of the bridge or ferry are under great liabilities to the public; are compellable to permit the public to use them, paying toll. To use the words of the old law as to ferries, “ they are liable to grievous amercements,” for non-performance of their duty.
It has been argued that the legislature has the right of determining upon the expediency of granting bridges, turnpikes and ferries, and that those grants are tq be taken subject to the implied right of the legislature-to make - others, wherever and whenever, in their opinion, the public good requires, without compensating for any injury which former grantees may receive from such subsequent grants, in any other way or degree than to the legislature itself should seem right.
If that proposition be true, it proves that legislative grants may indirectly be avoided and defeated, at the will of the grantors ; so that, their grantees for valuable consideration will not, in fact, have any beneficial rightnf property in them. It would *505 by implication insert in every such grant a provision, that it should be held at the will of the grantor, notwithstanding it purported to be for certain years to come.
Much reliance has been placed upon the case of Tripp v. Frank, 4 T. R. 666. That was an action for an alleged injury to Tripp’s ferry over the river Humber, from Kingston upon Hull to Barton. The defendant carried passengers from Kingston to Barrow, three miles below Barton. But those passengers had no intention of going to Barton, but only to Barrow, and the ferry-men were under no obligation to carry them to Barrow. The court held, that they were not obliged to pass over the ferry to Barton, (where they did not want to go,) to get to Barrow circuitously, when they might go thither directly in the defendant’s private market-boat.
Let us suppose the Charlestown ferry in operation, and adapt that case to the adjacent topography. Substitute Charlestown for Kingston, Boston for Barton, Sewall’s Point in Brookline for Barrow, and Charles river for the Humber, and the case would stand thus, upon a comparison with the case at bar. If a passenger wanted to go from Charlestown to Sewall’s point, he should not be obliged to pass over the ferry to Boston, and from thence to Sewall’s point by the way of the Roxbury neck, or Western avenue, if he could get an individual to carry him in his boat directly to Sewall’s point. Be it so. But suppose the passenger really wanted to go to Boston, and procured an individual to carry him a little above or a little below the ferry-ways on the Boston side ; that would be a fraud upon the owner of the Charlestown ferry. “For (said the court in Tripp v. Frank) if certain persons, wishing to go to Barton, had applied to the defendant, and he had carried them a little distance above or below the ferry, it would be a fraud on the plainri'ff’s right, and would be a ground of action.” Now, if it were not for the great respect I have for my learned brethren, I should have thought that that case was much in favor of the plaintiffs. It proves conclusively, that the franchise extends beyond the ferry-ways, and protects the owner against near and injurious transportation. It seems to point out, in direct and strong language, the injury which the defendants inflict. They transport persons who desire to go to Boston, taking them up *506 a little above the old ferry-ways on the Charlestown side,- and landing them a little above the ferry-ways on the Boston side. The court say, in the case cited, that “ this is a fraud upon the plaintiff’s right.”
There is a provision in a colonial ordinance, ct that whosoever hath a ferry granted upon any passage, shall have the sole liberty for transporting passengers from the place where such ferry is granted, to any other ferry-place where ferry-boats are to land, and any ferry-boat that shall land passengers at any other ferry, may not take passengers from thence, if the ferryboat of that place be ready.” For example,-—it might be lawful for the Winnesimmet ferry-boat to carry passengers to Charlestown ferry, but not from thence to Boston, unless the Charlestown ferry-boat was not ready. Col. Laws (edition of 1672), 50, tit. Ferries.
But it is said that there has been a uniform course of legislation which should govern the construction of the grants now under consideration. And we have been referred to the charters for the West Boston bridge, the Canal bridge and the Prison Point dam, the Mill-dam or Western avenue, South Boston free bridge, Malden bridge, Chelsea bridge, which destroyed Winnesimmet ferry, and of two parallel turnpikes from Boston to Watertown.
In regard to the Western avenue, perhaps it could not be considered a nuisance to the Charles River bridge, especially after the proprietors of the Charles River bridge had received compensation from the West Boston bridge which is between them. Besides, the Western avenue leads from Boston westerly to Brookline, and would not materially, if at all, affect the course of travel between Boston and Charlestown, communicating with the northerly and easterly parts of the State. If the plaintiffs had complained against the proprietors of the Western avenue, it is very probable that a jury would not have found it to be a nuisance, in view of all the facts which have relation to it.
In regard to West Boston bridge, such compensation was required by the legislature to be made, as induced the proprietors of the Charles River bridge to acquiesce. They had an extension of their charter for thirty years beyond the term of *507 the original grant, and the fact, t£ that the erection of the proposed bridge might diminish the emoluments of the proprietors of the Charles River bridge,” was mentioned in the report of the committee which was accepted by the legislature, as one of the reasons which induced them to make the additional grant. It is true, indeed, that the committee report as their opinion, ££ that there was no ground to maintain that the act incorporating the proprietors of Charles River bridge, was an exclusive right to build over the waters of Charles river." And that opinion may be very well founded ; for the river extends many miles beyond West Boston bridge to places which could not be considered as near to Charles River bridge. Besides, it is at most to be considered as the opinion of one party to a contract. But it was represented by the proprietors of Charles River bridge, that it would 1£ operate injustice and injury ” to them, if the legislature should grant the charter for the building of the West Boston bridge. The corporation did not apply in forma pauperis, but under a claim of right ; and the legislature thought it reasonable and proper to make the additional grant. But why was it reasonable or proper, if, by the true intent and meaning of the original grant, the proprietors of Charles River bridge were limited to the width of their bridge ?
It was said and not denied, that the free bridge at South Boston was not opposed by a majority of the proprietors of South Boston toll bridge, because their real estate would rise in value more than they would lose by the free bridge.
The Winnesimmet ferry is over a wide arm of the sea between Chelsea and Boston. It sustained some damage by the Malden bridge (which was erected where the penny ferry had been before kept), but more damage by the Chelsea bridge. If Williams, who owned the Winnesimmet ferry, had taken any legal measures to vindicate his rights, they would have been ascertained, and the injury redressed, if any had been sustained. The law was as free to him as it was to Chadwick. All that is proved in that case is, that the legislature did not think it was one which required a compensation. And from Williams’s acquiescence it may be inferred, that he did not think it was worth the trouble and expense of a lawsuit.
The same remark may apply to the case of the rival turn *508 pikes. There has been no judicial investigation. We know not how far the proprietors expected their indemnification to arise from toll, or from the additional value which their roads would confer on some other property of the proprietors.
All the injury sustained by the Malden bridge, by the erection of Chelsea bridge, was compensated by permitting the former to become interested in the latter.
In the case of the Canal bridge no compensation was granted to the plaintiffs. Probably the legislature believed that a great part of the travel which would pass over the Canal bridge would have passed over the West Boston bridge, for the building of which, compensation had been made to the plaintiffs, by an additional charter.
And the Prison Point dam was for the accommodation of persons going from Charlestown to Cambridge, and so within the principle of Tripp v. Frank.
Sometimes the legislature made a compensation to a party injured by their grant, and sometimes they did not. In the latter case the presumption would be, that they thought the party had no just claim for damages ; and if he acquiesced, that presumption would be strengthened.
In most cases the compensation was accepted, and of course there was nothing heard of claims for damages in such cases. Thus, on the same day that the charter for Haverhill bridge was granted over the Merrimac, a charter was granted for a bridge over the Piscataqua. And a provision was made for compensating the injury which the ferry there would receive, somewhat analogous to that which was made to Chadwick. But no provision for a jury was made in either case. Whether Rice (who owned the ferry) accepted it or not, I do not know. If he had resisted, his legal rights would have been maintained.
It is not safe to follow legislative precedents in the formation of a judicial opinion. We have a report of my Lord Coke, of an unwarrantable grant made by Queen Elizabeth, and a similar grant made by her father, Henry VIII., was cited to support the grant of the queen. But the court, “ nullo contradicente aut reluctante, ” held her letters patent to be void. I would say in regard to this part of the case, as the court did in. that, “ quod judicandum est legibus, non exeinplis.”
*509 It has been contended for the defendants, that if the legiskture could not lawfully grant bridges and ferries when and where they thought the public good required, great inconveniences would follow. Now I am not disposed to maintain in this argument, that the legislature may not grant as many charters for bridges, Ac. as they may think necessary for the public accommodation. Let them take private property for public uses, but not in welcome, unless it be given ; nor at their own price against the will of the owner, but subject to a compensation to be fixed by a jury of the country.
That is the manner in which private property is protected in England. And when it is taken by the authority of parliament for public uses, the special authority must be strictly pursued. Rex v. Croke, Cowp. 26. If the persons refuse or are unable to agree, the damages are assessed by a jury. The government take what they want for the public accommodation, but they pay for it, at an agreed price, or an assessment of a jury. Leader v. Moxton, 3 Wils. 466. In New York the same just principles are adopted. The People v. Platt, 17 Johns. R. 195 ; Bradshaw v. Rogers, 20 Johns. R. 106.
Again, it is said that the rule contended for by the plaintiffs is impracticable and uncertain. How near (it is inquired) is it within the authority of the legislature to grant a new bridge, without creating a private nuisance to one which had been before granted ?
Now I think the plaintiffs are not to answer that question “ by compulsion.” It is not necessary for them in this case, to fix precisely how far on each side of their bridge their franchise extends. If they are not confined to the width of their bridge, the defendants’ bridge must be considered near. It is in effect side by side. It leads from the same promontory in Charlestown to the shore directly opposite. So that if the terms of the original grant of the ferry and bridge were less extensive than the law would imply, they are certainly broad enough to cover the place where the new bridge has been granted, unless, as has been before said, the right be confined to the width of the bridge. But if the terms of the grant were as broad as a grant of a ferry across a river, and the question should be asked, how near to it another should be granted, I *510 would answer in the words of the books, so near as not fo impair the profits of that first granted. Or, to use the words of Chancellor Kent in Ogden v. Gibbons, 4 Johns. Ch. R. 161, when speaking of the freehold interest in a ferry, or fair, or market, “ the grant must be so construed as to give it due effect, by excluding all contiguous and injurious competition.” These questions may be settled in regard to a bridge, just as they have been for ages settled in regard to a ferry They are to be tried and determined by a jury, unless, as in the case at bar, that mode of trial is waived by the parties, who consent that the court shall try the facts as well as the law. Thus it is said in Fitzh. N. B-. 184, A, note b : “ It shall be put in issue, whether it be a nuisance or not.” 16 Vin. 26, tit. Nuisance, G. pi. 2, S. P. To maintain that issue, the law would require of the plaintiff to prove that his was the elder franchise, that the new one was near, and that it impaired the profits of that which was first granted. Haverhill bridge was, in contemplation of law, near to Chadwick’s ferry, although it was at the distance of forty rods.
But then it is inquired, what diminution, or shall every possible diminution of profits entitle the owner of the ancient franchise to a remedy ? That question need not be definitely settled in this case, for the new bridge has already taken three fourths of the profits of the old one. But I have no difficulty in meeting that question. If there were only small damages proved, small damages would be recovered. If it came within the rule of de minimis, &c. the law would not concern itself to afford relief. There is no more reason why one entitled to small damages should not recover in this, as well as in any other judicial proceeding.
It was suggested in the course of the argument for the defendants, that the franchise, being a local incorporeal hereditament, might be considered as real estate, for the taking of which their act of incorporation makes provision for a compensation, to be ascertained by jury. But the provision was evidently intended to operate in a more limited sense. If that had not been the case, the word property (which is used in the constitution) would have been employed, instead of the words “ real estate.” It is clear therefore that no pro *511 vision was made for any injury to the plaintiffs’ franchise. I forbear to remark on the great amount of property involved in the decision of this cause. Immense as it is, it would be purchased too dearly by the violation of the plighted faith of (he State.
I lay out of the case all the objections which have been made to the right of the plaintiffs to have the benefit of their additional charter, by reason of any alleged fraud in obtaining it, or for an alleged want of an acceptance, or non-performance of duties required by it: — and in this, I am happy to concur with my brethren. The existence of the plaintiffs as a corporation is acknowledged in the charter to the defendants, and the validity of the additional charter can be properly questioned and tried in a quo warranto, in behalf of the State, and not in this incidental manner by a stranger.
Something was suggested in the argument for the defend ants, abouf the solicitude which the Court must feel in deciding against the validity of legislative enactments. It should be remembered however, that the solicitude which a judge should feel, does not arise so much from the power and situation of the parties, as from an anxiety to understand and declare the law of the land which is applicable to the case. When, after patient hearing and examination, he has arrived at that point, there should be an end of solicitude. The consequences, which may be expected to follow from the law, are common to the judge and his fellow-citizens. I speak not of personal consequences and expectations, which, as they have little or no tendency to show what the law is, are not to have influence in the decision. I am free to declare, however, that the principles and results which I would adopt, would be as beneficial, as they appear to me to be clear. There would be a continued and increasing confidence in legislative contracts. Men of capital and energy would embark their funds in enterprises of a public character, in the hope that their own fortunes might be advanced with the public prosperity. The State would command the wealth and services of the people. But let the reverse of this oe suspected, and public credit will be paralyzed. It is more sensitive than the plant which withers upon the touch, but will revive. Touch public credit, and it dies. It may stand *512 awhile, as a tree which has been destroyed by the worm at the root, but will yield neither fruit nor shade when most needed.
In the construction of contracts, the law regards the subject-matter more than the manner ; the substance more than the form ; the spirit more than the letter. “ In fide quid senseris, non quid dixeris, cogitandum.'” Cic. De Off. lib. 1.
There are some facts in the case which show the intent ant meaning of the parties to the act of 1784, in language not to be misunderstood. All the direct communication between Boston and Charlestown had been over the ferry there, from the first settlement of the country. The petitioners for the bridge referred the legislature to that fact. They in effect informed them of the sources from whence they expected to derive their revenue. The travel from the west and from the north and from the east, passing from Charlestown to Boston, was to pass over a toll bridge, instead of a toll ferry. And that toll was to be for the use of the petitioners. That was the ground work, upon which their then perilous enterprise rested. And the legislature, by granting their petition, assented to all the reasonable expectations which it had disclosed.
If it had been proposed to pass an act for the sequestration of the toll of Charles River bridge to an amount not exceeding 60,000 dollars, to build a bridge for the use of -the Commonwealth where the Warren bridge has been built, it is not believed that any member of the legislature would have voted for it. A sense of justice would have prevented the adoption of a measure so inequitable and oppressive upon its front. But what is the difference between a sequestration of the money actually in the plaintiffs’ treasury, and an act to prevent that amount from going into their treasury. I ask, what difference is there in effect, of the one and of the other upon the plaintiffs’ interest. The difference is in form only, not in substance, assuming, wnat it is believed cannot be denied, that all the travel over the Warren bridge would have passed over the Charles River bridge, if the Warren bridge had not been built.
By the 10th section of the 1st article of the constitution of the United States, it is provided, that no State shall pass a law impairing the obligation of contracts. By the 10th article of he declaration of rights in the constitution of Massachusetts, *513 it is pi ovided that “ whenever the public exigencies require that the properly of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor.” By the 12th, “no subject shall be deprived of his property, immunities, privileges or estate, but by the judgment of his peers, or the law of the land.” By the 15th, that “in all controversies concerning property and in all suits between two or more persons, except in cases in which it has heretofore been otherwise used and practised, the parties have a right to a trial by a jury ; and this method of procedure, shall be held sacred, unless, in causes arising on the high seas, and such as relate to mariners’ wages, the legislature shall hereafter find it necessary to alter it. ” It has not been contended that the case at bar falls within the exception.
6. I proceed to consider very briefly, the operation of the new bridge, and the consequences resulting from the grant of it.
When the charter for the erection of the Warren bridge passed, the plaintiffs had a right to the toll granted to them for the transportation over their bridge between Boston and Charlestown, for twenty-eight years then to come. The defendants are authorized by the legislature to build the new bridge, but they are to be paid for all costs and charges, and with interest too, out of the toll withdrawn from the old bridge. The effect will be thus to compel the plaintiffs to pay for the new bridge. But that is only the beginning of their trouble. When it is built with the money so by the legislature withdrawn from the old bridge, the plaintiffs are not to have it. In six years, or sooner, the State is to come into full possession of it in complete repair. If there should be no more legislation about the matter, it then becomes a free bridge. If the present rate of toll should be continued, it will probably take three fourths or more of the toll from the proprietors of the old bridge. If the rate should be lowered, a greater proportion will be withdrawn, and the State, (the grantor !) the party without whose permission the new bridge could not have been built, the party contracting with the plaintiffs, by force of their own act, will receive the toll to their own use. It would be very doubtful if the plaintiffs could collect toll enough at the *514 old bridge to pay the annuity to the college. And if the State should leave the new bridge open as a free bridge, the plaintiffs’ franchise will be utterly destroyed.
I think the last grant would not be supported by the law of England, if the question were between the king and his subject. The principles of the common law and of natural justice, would restrain the royal prerogative. The right of a trial by jury would be there maintained. It would be a matter of deep concern, that property should be less protected under our free institutions than it is in our parent country. We have embodied the principles of the common law and of natural justice in our constitutions of government, which are paramount to legislative enactments, and binding upon the judicial department.
Now with all my habitual and sincere respect for the legislature, I cannot but think that the grant to the defendants is inconsistent with the grants before made to the plaintiffs. The last act must have passed without a due regard to the constitutional rights vested in the plaintiffs. It impairs the obligation of the grants before made to the plaintiffs. It takes away their property for public uses, without compensation, against their consent, and without provision for a trial by a jury. It is therefore void.
In my judgment, therefore, the plaintiffs have maintained their complaint, and this Court should grant relief.
Parker C. J.
[After stating the pleadings.] Several preliminary questions arising out of these multifarious pleadings appear to us not to require much consideration. The first is, whether the act of 1791, extending the franchise of Charles R’ver oridge, was accepted or not. It was for the benefit of the corporation, and therefore may oe presumed to have been accepted. It was accepted formally by vote before the expiration of the first charter, and before the granting of Warren bridge, which is sufficient.
In regard to the relinquishment of double toll on the Lord’s day, it appears that from about the time of passing the act of 1791, they ceased to exact it, and that it has not been taken since ; which is a sufficient relinquishment.
There have not appeared, on the argument, any facts in con *515 croversy, which have any important bearing on the principal questions. The allegation of fraud in obtaining the extension of the charter has not been made a matter of argument, and it has been properly omitted ; for it does not appear that the legislature have ever called in question their grants on this or any other ground, and none but the public could raise that question ; and they, only by legal process, such as a quo warranto, under which the corporation might defend themselves against such a charge. Indeed the recognition by the legislature, of the corporation of Charles River bridge, in the very act incorporating the Warren bridge, and of théir right to continue, and discharging them from half the annuity to Harvard College, is a sufficient answer to this charge.
The way is thus prepared for the consideration of the real questions in the case, which are indeed of solemn import, and require, as they have received, the most deliberate attention which our time and opportunity will admit of.
The argument on the part of the plaintiffs rests upon divers propositions of a general nature, and upon the application of them to the facts which exist in this case.
The propositions themselves are either so clear as to be admitted by the counsel for the defendants, or so well settled by judicial tribunals of the highest authority, as would render any attempt to shake them wholly unavailing.
That a grant of land or other property, or of a franchise, by a legislative body, having authority to make the grant under the constitution by which alone they can exercise any power, is a contract touching the thing granted, which cannot be repealed, annulled, or restricted in its operation, by the power which grants, otherwise than according to a fair construction of the terms of the grant according to the rules and principles of law affecting like grants or contracts made by individuals, and by process administered by the ordinary judicial tribunals, was settled in the case of Fletcher v. Peck, 6 Cranch, 87. Indeed, without any adjudication, the principle so clearly and necessarily results from the original constitution of free governments, and the maxims of universal justice, that it never could be called in question but in times of misrule and anarchy.
That the property of individual citizens cannot be appropn *516 ated to the public use, except that portion of it which he contributes proportionally with all other citizens, without a just and reasonable compensation, and this not at the will of the public agents, but to be assessed and determined by his peers in a trial by jury, is declared by the 10th article of the bill of rights prefixed to our constitution, and in one of the amendments to the constitution of the United States ; declared only, and not enacted or for the first time made law ; for without these provisions, I hesitate not to say, that nowhere, except where a despotism of some kind or other existed, could the government lay its hands upon the property of any subject without making him a fair compensation, and hold it against the judicial power of such a government.
And even where no property is taken to the public use, but the rights and interests of any one in a contract shall be attempted to be impaired or destroyed by an act of legislative power, such act becomes wholly inoperative and void by a most wise and wholesome provision of the constitution of the United States, which has been enforced in several cases of the highest importance, by the Supreme Court of the United States.
These fundamental principles are no longer considered disputable ; they are admitted in their fullest extent by the counsel for the defendants in this case ; and on the other hand, it is admitted by the plaintiffs, that an act of the legislature, whether it be a law, or a grant, or a contract, if not repugnant to either constitution, cannot be called in question by the judicial tribunals on the ground of inexpediency, or injustice, or inconvenience to any individual citizen on whose property or interests it may have an injurious operation. So that the questions before us are not questions of principle, but of application of principles to the facts and circumstances of the case on trial.
To show then that the authority under which the defendants justify the erection and maintaining of the Warren bridge, which is so manifestly prejudicial to the interests and property of the proprietors of Charles River bridge, is not available to that purpose, the latter assert, that by virtue of the act of 1784 and that of 1791, and the consent of the President and Fellows of Harvard College, they became the lawful owners and *517 proprietors of an exclusive right of transportation by means of their bridge, of all passengers and vehicles over and across Charles river between Boston and Charlestown, for the toll established by the act of 1784, for the term of seventy years from the first opening of the bridge to travel ; that this was a franchise which they derived from the grant of the legislature, for which they paid a valuable consideration in the expense of erecting and maintaining the bridge, and in the annuity of 200Z, which they have paid and are bound still to pay to the President and Fellows of Harvard College ; that this is a property, within the sense of that term as used in the 10th article of the declaration of rights, and therefore, admitting that the public interests required it should he taken from them and appropriated to the public use, yet as no compensation is provided for them in the act by which it is attempted to be taken from them, that act is wholly void ; and that the bridge built under its supposed authority, as it diverts from their bridge a large portion of its travel and profits, is a nuisance, which ought by this Court, by virtue of its authority under the statute of 1827, c. 88, to be abated, or that some other sufficient remedy should be applied.
This is one ground on which it is supposed the bill ought to be sustained and relief granted, on the principles and provisions of the constitution of this Commonwealth, without reference to the constitution of the United States.
But it is also contended, that although the interests and rights of the proprietors may not come within the meaning of the term property, as used in. the 10th article, and although the act of 1827, incorporating the proprietors of Warren bridge, may not be construed to be an appropriation of their property to the public use, so as to make a provision for compensation essential to the validity of that act ; yet that the acts of 1784 and 1791 relative to the Charles River bridge, constituted a conIract between the public and the proprietors of Charles River bridge, by virtue of which those proprietors acquired a right, exclusive of all others, to the transportation over their bridge, of all persons who should have occasion to pass and repass between Boston and Charlestown, co-extensive with the right of the old ferry, for the term of seventy years, and that there *518 is an implied contract in those acts, that the public should not, through the legislature, grant authority to any other person or corporation to erect any bridge, or to establish any other mode °f transportation, so near to Charles River bridge as to draw from it any portion of its travel, and thereby diminish its profits; and that the act incorporating the proprietors of Warren bridge necessarily having this effect, without providing any indemnity for the proprietors of Charles River bridge, is void by the constitution of the United States, which inhibits any State fr< m making or passing any law which shall impair the obligation of contracts.
These two propositions, on which the merits of the bill rest, are in some measure distinct in their character, as they are referred for their support to the different constitutions of the United States and the Commonwealth, but the same general principles seem necessarily involved in both : or at least both of them, to my mind, seem to be equally affected by the .provision of the constitution of the United States. If by virtue of the legislative acts, and the supposed succession to the rights of the college by virtue of those acts, a property was acquired in the franchise of toll to the extent contended for in the first proposition, it is because these acts assume the character of a grant or contract to that effect; and then a subsequent grant to another corporation, inconsistent with the right so acquired by the first, unless in a form warranted by the constitution, would be, directly or indirectly, but necessarily, to ii jpair the obligation of the first contract, and so would fall within the prohibition of the constitution of the United States, as well as within the 10th article of the declaration of rights in the constitution of Massachusetts ; so that a decision on either branch of the case would seem to me liable to a revision by the Supreme Court of the United States, within the constitu.ion and laws providing for the appellate jurisdiction of that court.
In discussing the first proposition, it seems to be necessary to consider briefly the right enjoyed by the college to the ferry, previous to the act of 1784, by which the building of Charles River bridge was authorized ; and then, whether by virtue o* *519 that act that right, whatever it may have been, was transferred or passed over to the proprietors of Charles River bridge.
The property or right in the ferry is supposed to have been granted to the college, by the existing government of the colony, in the year 1640 ; which was two years after the establishment of Harvard College, according to the account of this institution given by Hutchinson, its foundation by the government having been laid two years before, viz. in the year 1638. In an ordinance respecting the college it is recited, that “ for the encouragement of the college this court hath given the sum of 400Z. and also the revenue of the ferry betwixt Charlestown and Boston.” This I should judge was in 1638, a ferry then being in existence by authority of the colonial government, probably under lease to Converse, it appearing to have been leased to him in that year by some agents of the government. This first grant to the college, of the revenue of the ferry, perhaps would not be construed to be a grant of the ferry itself in full property, but might be satisfied by leaving the property and right and the whole control to the government, paying over to the treasury of the college the net revenue thereof.
But in 1640 a direct grant of the ferry itself was made to the college, which, according to the usual interpretation of the simple terms generally made use of in public proceedings of that day, would be construed a grant of the ferry itself and all its rights to the college in perpetuity, unless the effect should be found to have been controlled or restricted by contempo rary acts, or acts passed soon after, showing clearly the intent of the legislature to have used the term grant in a more limited sense. The words of this grant are, “ the ferry between Boston and Charlestown is granted to the college.” This probably was intended to grant to the college no more than what had been previously granted, that is, the revenue of the ferry or the profits of it; because the ferry itself was at that lime in the hands of Converse or some other lessee, it appearing that in 1637 power was given to the governor and treasurer to let it for three years, and Converse being the lessee *.i 1638. And in 1640 authority was given again to let it on the expiration of Converse’s lease. And that this was the sense in which the grant was considered, may be inferred *520 from the ordinance of 1650, by which the power of leasing is given to the college, the ferry having been until that time, leased by authority from the government, the college enjoying undoubtedly the rent. And in 1654, “ it is ordered by this court and the authority thereof, that besides the profit of the ferry foimerly granted to the college, which shall be continued, there shall be levied,” &c.
To me it appears, from these several colonial acts respecting the college and the ferry, that the absolute property in the ferry itself was not intended to be vested in the college ; but still, as it was undoubtedly intended that they should enjoy the revenue, and as they did enjoy it, under various modifications, down to the time of the incorporating Charles River bridge, it would be considered that the government charged itself as trustee of the ferry for the benefit of the college, and that after-wards they relinqui hed this trust, and the college thus became owners of the ferry, subject to such regulations as should from time to time be made by the legislature for the public accommodation and convenience. These regulations are not inconsistent with a right of property in the college, for the legislature having originally the only right to grant the exclusive privilege of transportation over public waters, and to establish tolls, &c. the grant of this privilege would always be consider ed as subject to the superintendence of the legislature, unless that was expresly surrendered.
I entertain no doubt, therefore, that in the year 1785, Harvard College was the proprietor, in the sense above mentioned, of the ferry between Boston and Charlestown, and that it could not constitutionally have been taken from them without their consent.
But what was the ferry-right conferred by the colonial government on Harvard College ? Was it exclusive along the whole shores between Boston and Charlestown, or limited to the ferry-ways as they existed at the time of the original grant ? It does not appear to me that either one or the other of these constructions is the true one.
It is material to consider the state of things at the time, in order to ascertain the nature and extent of this grant. There was pre-exist:i’g a ferry, which was the object of the grant; it *521 was in the hands of Converse under a contract with the government ; it had been established before the lease to Converse, and all the subsequent proceedings must be supposed to have had reference to the ferry as at first established.
The first we learn of it is from the record of the court of assistants, entered November 9, 1630; probably the first act of legislation by the new government. It is ordered, “ that whoever shall first give in his name to Mr. Governour, that he will undertake to set up a ferry betwixt Boston and Charlton, and shall begin the same at such time as Mr. Govern-our shall appoint, shall have Id. for each person,” &c. And on November 5, 1633, there is this record ; “ Mr. Richard Brown is allowed to keep a ferry over Charles river, against his house, and is to have 2d.” &c. This ferry was then from the Charlestown side only, and in 1635, it was ordered that there should be a ferry set up on the Boston side, by the Wind-mill hill. In 1637, or 1638, the ferry, that is, the existing ferry, between Charlestown and Boston, was leased to Converse. And in 1640 the same ferry, that is, the ferry then existing between Charlestown and Boston, is granted to the college.
Now I am not able to gather from these records, any thing like an exclusive grant to the college, of a ferry along the whole shore of the two towns. It was exclusive in one sense ; that is, no individual could set up another ferry without the license of the government, who had the ordering and disposition of all passages over public waters ; but I think the government itself was not precluded from establishing another ferry between Boston and Charlestown as soon as the population of either town should have so spread as to have rendered it highly inconvenient to be confined to the old ferry. If, for instance, West Boston, then probably a waste, had in twenty years afterwards become as populous as it now is, and a ferry from a southerly point in Charlestown, to Barton’s point had been deemed to be for the public convenience, I think the colonial legislature would not have hesitated, and I think that they need not have hesitated, to establish such a ferry, without making any compensaron to the old ferry, unless an actual injury was thereby done, because they bad done nothing in their former grants which could be fairly construed to take away this right. They *522 granted a ferry between Boston and Charlestown, or the ferry as it then existed with reference to the actual state of population and business, without restraining themselves prospectively from providing for future exigencies.
They certainly did not mean to secure to the owners of the ferry the right to transport for toll all who should have occasion to visit Boston through Charlestown, or the country from Boston, for two centuries, and as much longer as the country should endure. They were providing for existing necessities ; they were desirous of adding something to the income of the college, and established in their favor this easy contribution from the people, valued at about 40Z. per annum ; and this was to continue with all itá natural increase until the throng of passengers should demand another ferry, or a bridge, or some other mode of transportation ; then, if it became necessary to destroy the ferry, they would have been bound to indemnify the college for their actual loss ; or if they diminished their income, they were to make it good, because it was within the fair construction of their grant, that they would do nothing to defeat it or diminish its actual value. They could not have resumed their grant of the ferry, without paying the proprietors, nor could they indirectly destroy its value, by the grant of another ferry so near as to draw away its custom. But liad the public interest required that a bridge should be erected instead of a ferry, of which public interest the legislature must be the judge, they could consistently with public justice and with the right of nrivate property have made this change, only providing for a just compensation to the proprietors, for the value of the property as it would then be estimated. This restriction upon the sovereign power does not, I apprehend, depend upon any limitation of its authority by written constitution, but results from the immutable principles of justice, which require an equal contribution to public exigencies, and would prohibit the sacrifice of the property of one, even for the advantage of the whole Such principles are recognised in all civilized governments, and if not expressly declared, are practically acted upon. 2 Kent’s Com, 270. I speak of acts of the government the direct and immediate effect of which is the destruc ■ tion of private property, or the appropriation of it to pubh - *523 usa. There are cases of a questionable nature, wtiere great private loss may be the consequence of some public act for the general good, which do not fall within this principle.
It is the right and the duty of all governments, especially those over new countries, to facilitate the intercourse of business between its subjects by opening new roads and constructing new avenues as the population, and the consequent demands for such improvements, shall increase. In doing this it will often happen, that estates upon old roads are diminished in value ; the seat of business may be transferred from one town or village to another ; inns and stores, erected with a view to the travel or business as it exists, may become deserted and of 'ittle value ; but the proprietors would have no claim upon the government for redress, for it is necessarily one of the contingencies on which property is acquired and held, that it is liable to be impaired by future events of this kind.
The whole history and policy of this country from its first settlement, furnish instances of changes and improvements, the effect of which has been to transfer the adscititious value of real estate in one town, resulting from its favorable position for trade, to another, which, by alteration of roads, erection of bridges, or more recent interior settlements, has taken its place as a thoroughfare, or as a place of transit or deposit for articles of merchandise. Losses of this kind never have been, and probably never will be compensated ; nor can compensation be reasonably expected by the sufferers, any more than by the dealers in any branch of trade or in any mechanical employment, who find their profits and emoluments diminished and sometimes destroyed by the change of fashion, or by new inventions for carrying on the same branch of business in a cheaper and more acceptable manner. Such losses are the effect of the general system of legislation upon subjects of this nature, adopted in the early part of our history, and constantly practised through all the changes of government; so that property is in fact held upon a tenure which admits of its detenoration in value from causes of this kind.
And I confess I do not see why the same principles do not apply to property in ferries and bridges to a considerable, if not to the whole extent. Ancient ferries held by prescriptive title, *524 if there be any such in this Commonwealth, — which may be doubted, as it is well known that the government originally assumed the right to establish and regulate them, either by the direct act of the legislature, or by the power delegated to courts of sessions or towns, and therefore their title may be found on record, — ancient ferries held by individuals may be subject to the rules of the common law, qualified by the usages, and the general legislative provisions of this Commonwealth, or of the antecedent governments. Certainly the proprietors may maintain their rights against individuals who invade them without authority, by the application of those rules.
By the common law, if there be an ancient ferry and another be set up near to it, so that its profits be diminished, an action will lie for damages, and probably also the use of the new ferry may be restrained by injunction from chancery.
I imagine the mere fact of diminution of toll to the ancient ferry would not prove the new ferry to be a nuisance, if it were set up under license of the government. It must in a positive sense be near to the old ferry, and not merely so near as to draw away some of the custom ; for that may happen if the ferries are five miles apart. This is the doctrine of the books, though it is sometimes held, that if the new ferry 'only be so near as to produce the injury, it is a nuisance. This latter doctrine certainly could never have been received in this country. Ferries were first established to accommodate the inhabitants, who were generally settled on the shores of bays or creeks, or on the banks of rivers. They were connected with roads leading to some market town, and settlers in the interior were obliged often to go by circuitous routes in order to cross a river, or other water obstruction, by a ferry. As the population increased in the country, new and more direct routes would be explored to the sea-ports, and they would come to the river several miles above or below the ferry. A new ferry,or a bridge in the line of the new route would be demanded for common convenience and necessity, but thereby the profits of the old ferry might be materially diminished. Cannot the public authorities establish such a necessary accommodation without making compensation for the loss ? I think the answer must be in the affirmative.
*525 I have seen no case which denies this right, but several which recognise the principle. The case of Chadwick v. The Proprietors of Haverhill Bridge, does not contradict it. Chadwick’s ferry, as stated in the account of the case given by Mr. Bane in his Abridgment, was ancient; the bridge was built within forty rods. Upon Chadwick’s representation to the legislature, provision was made for his indemnity by commissioners. He preferred an action at common law, which was submitted to reference, and an indemnity was awarded to him. There was no decision of the Court, but it may be inferred that the action was considered as rightly brought. As that is the only case to be found on our judicial records, it is unfortunate there was no discussion óf principles. All we can know is, that by the erection of the bridge, the ferry was entirely destroyed, and that upon such a question it was intimated by the Court, that a party so situated had a right to his trial by jury. Whether the nearness of the bridge to the ferry, and the consequent abolition of the ferry, was not the material fact on which the cause turned, does not appear, or whether, if the bridge had been authorized a mile above or below the ferry instead of forty rods, an indemnity would have been thought necessary, cannot be ascertained. At most, the case is authority only for a decision, that if a bridge be built by license of the legislature within forty rods of an ancient ferry over the same river, the proprietor of the latter is entitled to indemnity.
In the case of Tripp v. Frank, the plaintiff was lessee of the corporation of Kingston upon Hull, of a ferry which the corporation held by prescription, between Hull and Barton, on the opposite coast, at the distance of seven miles. The defendant carried persons at several times in his own boat from Hull to Barrow, which is two miles lower down the Humber than Barton. The court held that the action could not be sustained, unless the object of the passenger was to get to Barton by the way of Barrow, and so the transportation by the defendant was in fraud of the ferry.
This case, though it recognises the general principle of the common law in regard to ferries, yet is pregnant with qualifications which are exceedingly important in the consideration of *526 this subject. It is stated in the case, that there was no other ferry on the Lincolnshire coast upon the river Humber ; consequently all who would pass from Hull to the other side of the river for a great distance, would be obliged to cross this ferry, unless private persons should accommodate them with a passage in their boats. Of course such accommodation would materially affect the profits of the ferry ; but it was held unreason able to require that persons going to Barrow should be obliged to land at Barton and go from thence two miles by land down the river to Barrow. For the same reason it must have been held, that persons might be transported from Barrow to Hull, without going to Barton to take the ferry there. The plaintiff’s right of ferry exclusive was only betwixt Hull and Barton. Hull is a place of great business, with a population of 27,000. Barton has a population of 6000, and Barrow somewhat short of 2000. Between the latter place and Hull there must necessarily be great intercourse, Hull being a great market town.
Upon this principle, the transportation of persons from Boston to Cambridge, either at Cambridge Port or at Leclimere Point, would be no infringement of the right of the ferry between Boston and Charlestown, and consequently the grant of the bridges in these several places could not be questioned on the ground of interference with their right.
I should further infer, that a ferry from the southerly part of Charlestown to Barton’s point in Boston, might have been established without any right in the proprietors of the old ferry to complain, because there is a grant of a ferry or the ferry then existing, between Charlestown and Boston, which was practically limited from Charlestown to the northerly part of Boston.
The case here commented on turned principally upon the question put to counsel, whether the lessee of the corporation was obliged to carry any passenger to Barrow; and upon its being answered in the negative, the court said the right was commensurate with the obligation. So in the case supposed, it is clear that the owners of the ferry could not be obliged to carry persons to West Boston, and therefore they had no right to toll from persons going there.
If it should be said that this case recognises an exclusive *527 right in the corporation of Hull to transport persons from one side of the river to the other through the whole extent of the two opposite towns of Hull and Barton, and that the right of the college was therefore exclusive between Charlestown and Boston, I should say they proved their exclusive right by prescription and usage, and the right of the college depends upon the words of their grant, which words are not exclusive ; and that Barton’s point, at the time of the grant to the college, was as distinct from Boston, as contemplated by the colonial government, as Barrow is from Barton ; it being the circumstances of the places and the distance, not the mere fact that they were distinct towns, which governed the decision.
And the same qualifications of ferry rights were adopted on a more general scale, in a case in the exchequer in the year 1659. There was an ancient ferry by prescription at Branford in Middlesex, and the defendant had usually in his boat ferried over persons about three quarters of a mile from the old ferry on the Thames, to the prejudice of the plaintiff’s common ferry ; and the suit was to suppress the new ferry. The court dismissed the bill, saying it came too near a monopoly and restrained trade. The reporter, Hardres, subjoins a query, but it is difficult to ascertain whether he disputed the principle, or the application of it to that particular case. He cites 22 H. 6, to support his query. On looking at the case, it does not an pear to contradict this decision, for it is laid down by two judges arguendo, that a new market or ferry set up near an old one, whereby its customary profits are reduced, would be a nuisance ; which is not disputed. Whether a distance of three, quarters of a mile would be beyond the rights of the old ferry or not, does not appear.
I infer from these cases and others cited in the argument, that it is not the mere diminution of profits occasioned by a new ferry, which constitutes it a nuisance to the old, but to produce this effect, the new one must be established within the range of the exclusive right of the old one, which is to be settled by proof of use in the case of a prescriptive right, and by the grant, where one exists ; and that such rights, being in derogation of the common right of the public, must be construed strictly. Now it is true, that until the year 1785 there was but one *528 ferry between Charlestown and Boston ; and that all passengers to and from these towns used that ferry ; so that if the college rested upon prescription for the proof of its right, they may have had some claim to the exclusion of any other ferry or right of transportation, as was the case of Chadwick’s ferry, and the ferry between Hull and Barton. But deriving their right under a grant from the government, which is not exclusive in its terms, they are limited to the rights conferred by the grant.
But it is said, that if the ferry right is restricted to the ferry ways, it is of no value, for the value of the franchise depends upon tolls, and these, upon passengers, and if another ferry could be set up along side of theirs, or a bridge more especially, their franchise is destroyed.
And it must be confessed, such is the consequence of the doctrine I have advanced, if it cannot be limited by some sound rational principle, consistent with the public right of providing accommodation for the citizen, and the private rights of the corporation under their grant. I think I can discern such a principle, and it is one which, in my mind, influences and determines the case in reference to the second ground of the argument, which is founded on the supposed violation of the constitution of the United States.
I do not think that any such property is established in the college, as is contemplated in the 10th article of the declaration of rights and protected from public appropriation without provision for indemnity. The actual property is only in the toll which is earned on the bridge, and in the franchise of the bridge, which is the right to obstruct the navigable water, and take toll of those who pass over. An act of the legislature requiring the toll taken to be paid into the public treasury, or that the bridge itself should be taken to the use of the public, or that it should be open for public use without any toll, would come within the terms of that article. But an act which only consequentially injures it, would not. Still, I think, without regard to that article, by the very principles of the constitution, and the nature of our government, the legislature are prohibited from doing other acts injurious to the property of the subject, and that the judicial power would be bound to protect the sub *529 iect by declaring such acts void. Suppose, for instance, the legislature should grant the same ferry to another, prohibiting the use of it by the first grantee ; there would be no pretence that this would be an appropriation to public use, and yet the second grant would be void, for the courts would declare, that the public, having parted with their right, had nothing to grant. This would be decided upon the principles of the common law, as we find them applied to the grants of the king. 2 Bl. Com. 37 ; 2 Rol. Abr. 191, Prerog. E7, pi. 2. Or, if the legis lature should reduce the toll, no power to do it having been reserved in the grant, the toll could nevertheless be recovered in an action at common law, on the ground that the act of the legislature was an unwarrantable interference with private property, a violation of their own contract or grant. Suppose the ferry granted for a term of years, and by another act it was made to terminate in a less time ; the ferry would nevertheless be upheld by the law, during-the term of the grant, upon the same ground, that the legislature had no right thus to interfere with private property, or to impair the obligation of their own contract.
This principle has been practically applied by the legislature itself in many instances. In some cases the legislature, in the grant itself, has reserved the right of declaring a forfeiture upon the breach of conditions, which otherwise could only be done by a court of law ; in others, they have reserved the right of regulating or reducing the toll after a certain number of years. These provisions show the sense of the country and of th successive legislatures, that grants from the public to individuals convey rights which are not to be judged of and vacated by the grantor, unless the grant itself retains such power ; if it does, then it is by consent of those who accept such grants.
Another thing seems to me to appertain to grants from the public, as well as individuals ; which is, that notwithstanding it is said in the books they are to be construed strictly, and in cases of doubtful construction, in favor of the public, yet the construction is to be reasonable and consistent with its manifest purposes and intent. It may be true, as is stated in some of the English books, that nothing is to be held to pass by implication only, as may be the case in private grants ; but yet the *530 just and equitable principle, that whatever is necessary to the profitable use of the thing granted, shall be considered as inherent in the grant, will apply as well to the public, being grant- or, as to a citizen. If the public should grant the right to cut timber on public lands, without providing in the grant the means of ingress or egress over other public lands, could it be maintained that thé grantee would be a trespasser in passing over such lands necessarily, in order to get at or draw out his timber ?
If the doctrine of the common law in relation to grants from the king should be otherwise, I think it would not be applied to a grant from the United States or the Commonwealth. It would be unreasonable and savour strongly of partiality for the government in its contests with citizens. I admit, that where the grant of the public is clear and explicit as to the thing granted, and there are general words which may by implication carry other things if the grant had been from one citizen to another, on the legal maxim that the words are to be taken most strongly against the grantor, the English rule, that nothing shall pass by implication, may apply. But as to the inherent qualities of a grant, and the construction of it in relation to the thing clearly granted and its necessary attributes, i cannot but think the rule is the same for public and private grants.
Now when the government grants a ferry or any other franchise, it unquestionably intends to grant the undisturbed use of it, so far as respects any acts of their own or of any persons acting under their authority. The very grant itself contains an implied contract or covenant to this effect. It is the very essence of the obligation. Now admitting that the grant of the government to the college gave no exclusive right of transportation of passengers &c. over Charles river between Charles-town and Boston, yet I think it gave the free and uninterrupted right of receiving toll from all persons who would, in the usual course of travel, cross that ferry, and that the government contracted not to divert the passengers into any other route, unless the public convenience and necessity should require it; and when that should happen, that they would establish the new route, so as to do the least possible injury to the pre-existing right; but in doing this, if it were necessary to destroy the old *531 ferry or materially and essentially to diminish its value, compensation should be made. As, for instance, should they determine that another ferry should be established within ten or twenty rods of the old one, and in consequence the profits of the old one should be reduced one half, it seems to me indemnity should be made, and if it were not, the proprietors of the old ferry might maintain an action for damages ; but if it should happen that the new accommodation itself caused an increase of travel, so that the old ferry should receive its usual custom and profits, notwithstanding the establishment of the new one, there would be no ground of action, because there would be no injury : and there being no exclusive right to all the ferrying across the river, there would be nothing to complain of.
This appears to me a very reasonable doctrine ; but I confess I am not able to adduce any authorities in support of it. I ground it on the principles of our government and constitution, and on the immutable principles of justice, which ought to bind governments as well as people.
It leaves to the government the right of determining what the public good requires, and gives security to the citizen against unequal contributions to that object. It maintains the faith of government in its contracts with and grants to its subjects, without restraining the proper use of power in making improvements, which change of times and circumstances may require. It does justice to the public and the citizen.
If it be said, that a compensation, founded upon the actual state of profits when the franchise is impaired, is not complete indemnity, because the proprietors have a right to calculate upon future increased profits, I answer, that actual and not speculative loss is- the rule of damages upon a breach of contract between man and man, and that all the grantee can reasonably calculate upon is an indemnity for actual loss occasioned by a public improvement. It is upon this principle, I presume, that the legislature, when they granted authority to build the bridge at the place where the ferry had been kept, found it necessary to make provision for indemnity to Harvard College ; for thereby the ferry was destroyed, and this might have been considered an appropriation of the franchise belonging to the college to the public use. Had no provision been made satis *532 factory to the college, they could have maintained their action against the proprietors of the bridge, notwithstanding the license given by the government. The bridge would have been a nuisance, and if jurisdiction over nuisances had then existed, as now by virtue of the late act, this same process might have been maintained. So if the location of the bridge had been authorized at any other place, within the range of the ferry right as used, so that the travel would have been necessarily diverted, essentially diminishing the profits of the ferry, though this might not be an appropriation of the college franchise to public use, but only an injury consequential to the exercise of a right, yet there would be a remedy, because it would be a violation of the implied contract contained in the grant, that their franchise should not be disturbed or diminished in value, even for the public good, without making them whole ; and in order to come to this conclusion, it is not necessary to suppose an exclusive right to transportation between Charlestown and Boston, but only an implied stipulation on the part of the government, that they will grant no other similar r.ight, to the necessary and essential prejudice of the pre-existing grant.
Now it is perfectly within the reason of this principle, that another ferry or bridge might be granted between Cambridge and Boston, either from Lechmere Point or Cambridge Port to Barton’s point, without making any compensation to the proprietors of the ferry, because it was not even by implication covenanted that no such grant should be made ; for the utmost limits within which such covenant could be inferred are Charlestown and Boston. Cambridge and Boston are therefore excluded. So that to whatever extent the travel to Charlestown square, and so over the ferry to the northerly part of Boston, might be diverted by means of a bridge or ferry from any part of Cambridge to Boston, I think there could be no just ground of complaint. .Such was the opinion of the legislature in regard to the claim of rights on the part of the proprietors of Charles River bridge when the grants of West Boston bridge and of Canal bridge were made ; therefore, when they made provision for an extension of the time of Charles River bridge in the act incorporating West Boston bridge, it ought to be considered, according to the terms of *533 the grant itself, that it was not yielded as a matter of right, as compensation for an injury, but only as a gratuity. As such however, being founded upon an acknowledgment of a meritorious consideration, it is to have the same construction and effect as if granted as a matter of right.
It follows from this course of reasoning, to be my opinion, 'hat such were the rights of the proprietors of the ferry, that an act passed in the year 1785, authorizing the erection of a nridge from Charlestown to Boston in the line of the present Warren bridge, having the effect, which would have been inevitable, of rendering the ferry wholly useless, would have been void, as impairing the obligation of a contract, without a proper provision for indemnity. I think that granting a free bridge anywhere within the range of the ferry right, without compensation, would be void upon this principle, because it would absolutely destroy the franchise of the ferry. And so the establishing a ferry or bridge at a less toll than was enjoyed by the ferry, because the effect would be the same. The remedy by action would give damages proportionate to the injury, and upon a bill in equity it would not be necessary to abate the bridge as a nuisance, if the damage was not so great as to require such a procedure.
This long discussion of the rights of the ferry may seem inappropriate, when I declare that I am not satisfied that such rights, whatever they may be, have been transferred by the college to the plaintiffs. On this point I concur with my brothers Wilde and Morton, who have expressed themselves fully upon it. But as the same reasoning will apply to the rights of the plaintiffs derived from the act of the legislature under which they erected the bridge, there is no need of repetition.
In considering this question I shall confine myself to the act tself, as the origin of the plaintiffs’ right, taking the 8th section af the act of 1791, incorporating the proprietors of West Bos ton bridge, as a part of it, so that the franchise should be taken to be for seventy years, instead of forty, as provided by the first act, the legislature of that year having in effect determined that it was reasonable that their charter should continue so long.
There is a very remarkable omission of any enacting clause
v. *534 in the statute of 1784 declaring any purpose for which the corporation was created. In the title of the act, and in the preamble to the first section, can be found the intention of the legislature. There is a difference in the proposed object of the incorporation as it appears expressed in the title and in the preamble. It is not common to recur to the title for an explanation of the act, though it is sometimes done ; the preamble used to be called the key to the statute, but these keys have of late been omitted. Still, however, it is fair to consider this preamble as an enacting clause, for the sake of giving efficacy to a statute which created important rights, and which has frequently since been recognised as such by successive legislatures.
The words of the preamble are, “ Believing the erecting ol a bridge over Charles river in the place where the ferry be tween Boston and Charlestown is now kept, will be of great public utility, and Thomas Russell esquire and others having petitioned this court for an act of incorporation to empower them to build said bridge,” therefore, &c. Section 1. creates a corporation with the name of “ The Proprietors of Charles River Bridge.” Sect. 2. authorizes certain of the proprietors to call a meeting, for the making of by-laws, &c. Sect 3. establishes the rate of toll, and limits the grant to forty years after the opening of the bridge. Sect. 4. prescribes the manner in which the bridge shall be built. Sect 5. provides the annuity of 2001. to Harvard College, and that the bridge shall revert to and be the property of the Commonwealth, saving to the col lege a reasonable and annual compensation, for the annual income of the ferry, which they might have received had not the bridge been erected. Sect. 6. gives three years for the building of the bridge.
The act is en'itled, “ An act for incorporating certain persons for the purpose of building a bridge over Charles river between Boston and Charlestown,” &c.
Had there been an enacting clause in these words, without any provisions in the act tending to restrain their sense, there might have been room to contend that the proprietors were authorized to place their bridge anywhere between the two towns, and from thence might be inferred an intent on the pari *535 o. the legislature to grant an exclusive rightbut the preamnle which comes after the title, and so ought to be considered as explanatory of the general words in the title, and especially as it professes to set forth the cause and the object of the grant, limits the position of the bridge to the place where “ the ferry between Boston and Charlestown is now keptso that no authority was given to obstruct the river by a bridge in any other place between the two towns.
There is nothing in any part of the statute, from which an exclusive right to any thing beyond the limits of the bridge can De inferred. It is simply the grant of a license to build a bridge in the place prescribed, with the right to take toll from all persons and property which should pass over it during the continuance of the grant.
The legislature had the supreme control of all other parts of the river, so that any obstruction to vessels and boats other than that caused by a bridge extending across on the line of the ferry, would have been a public nuisance which any one might remove.
Further right might be granted by the legislature to obstruct the river by wharves or bridges, so that the erection of them would not be deemed public nuisances. The Warren bridge, therefore, built under the act of 1827, is not a public nuisance, for it is authorized by the sovereign power of the State to whose control the public waters belong.
But an erection which is not a public nuisance because it is authorized by the public, may be to the injury of private persons or corporations, and so become a private nuisance ; as at the common law, a ferry granted by the king which is to the prejudice of an ancient ferry held by prescription, or a market which interferes with a pre-existing market. Franchises so granted will be vacated, or the proprietor of those which may be thus injured may maintain his action against the disturber, notwithstanding he holds the patent of the king from whom such franchises are held to flow ; and this, although there should be no express saving of pre-existing rights. For it is held, that although such patents usually are upon condition express, that they shall be of no injury to any other person, Ita quod non sit ad nocumentum, &c. yet that condition is implied, *536 if not expressed. 2 Inst. 406 ; 2 Saund. 172. And this must be on the principle, that the contract created by the grant cannot be annulled or impaired by any act of the grantor ; , • • . • w^° ls m such cases the king, as representing by his prerogative the public, in the same manner that our legislature does.
Now it appears to me, that this just and equitable principle is applicable to grants made by our legislature, and public faith and honor require that it should be so considered.
The legislature grant a township of land, and afterwards make another grant of the same land ; this latter would be void, as before shown. So if they make a second grant of the same franchise. And by the constitution of the United States, they not only cannot annul, repeal or destroy their grant or contract, but they cannot impair its force or obligation.
Now what is the contract made by the public, by its agent, the legislature, with the proprietors of Charles River bridge ?
1. They shall have a bridge for seventy years across Charles river, in the place where the ferry between Boston and Charles-town is now kept.
2. They shall receive during that term a toll fixed in the grant, from all passengers, carriages, &c. which go over their bridge.
At the time of making this grant there was a ferry, over which all persons were carried who had occasion to pass between Boston and Charlestown.
It must have been understood when the bridge was opened for travel, and the ferry ceased, that these passengers would pass over the bridge and pay their toll there. This toll was the consideration on which the proprietors undertook to build the bridge, and to pay the annuity provided in the act for Harvard College. Could the legislature consistently with their grant have the next year granted another bridge parallel with the first, and opened it to public travel free of toll ? The answer must be in the negative ; unless they re-imbursed all the expense incurred ; for this would be in effect to resume their grant, which it is agreed they could not do. In the first grant they give a right to toll from all persons who should pass the bridge, and persons going to and from Boston and Charles-town would pass the bridge and pay toll. But they after- *537 wards provide means of transportation for the same persons, free of toll, and the necessary consequence is, that the first bridge is deserted. Now it seems to me, that by this the obligation of their contract is impaired, for that obligation is, that they will do no act whereby prejudice shall come to the first grantees. But here it will be said, that the public convenience may require the establishment of a free bridge ; that the people are poor and cannot afford to pay toll ; that the legislature is the judge of what the public interest requires, and it is their duty to provide for it. To all this I agree ; but then I say it only varies the quality of the contract. The grant being of the bridge with the right to transport those who have occasion to go to Boston or Charlestown, the contract of the government is, that this right shall not be disturbed or impaired, unless public necessity demand, and if it shall demand, the grantees shall be indemnified.
Such a contract as this, is founded upon the principles of our constitution, as well as of natural justice, and it cannot be impaired without a violation of the constitution of the United States : and I think also it is against the principles of our State constitution.
To prevent misconception, I will add, that I apply this reasoning only to cases which come clearly within the contract which results from the grant. The grant relates only to a bridge between Boston and Charlestown, and there is no implied covenant or agreement that there shall not be another bridge between any other town and Boston ; and if by reason of such other bridge the travel over Charles River bridge should be diminished and its toll reduced, the loss would be consequential upon the exercise of a public right not in any degree controlled or restrained by the prior grant.
But let us ook at the act incorporating the proprietors of Warren bridge, and see whether it does or does not impair the obligation of the contract with the proprietors of Charles River bridge.
That contract I have stated to be, that they should continue a corporation for seventy years, with the right to take toll from all persons, &c. who should pass over their bridge to and from Boston and Charlestown, and that the grantors will do nothing *538 to impair this right or dimmish the value of it, unless the public convenience or necessity should require, and if such necessity arose, the grantees should be indemnified.
The act of 1827 authorizes the building of a bridge over Charles river between Charlestown and Boston, beginning at or near Harris’s wharf in Charlestown, and ending upon certain new-made land in Boston : and the bridge is actually erected within from ten or fifteen rods of Charles River bridge on the Charlestown side, and about fifty rods on the Boston side. It receives the travel from Charlestown square, which before this act discharged itself by one avenue only, over Charles River bridge, and it conveys the passenger in a direct line to the market place in Boston, which was a principal object of travellers over Charles River bridge. The necessary and unavoidable consequence is, the taking from Charles River bridge a large portion of its toll, and, giving it to the proprietors of Warren bridge to re-imburse them for the expense of erecting their bridge. It is an admitted fact, that from one half to two thirds of the toll of Charles River bridge has been withdrawn.
There is nothing in the act which bears a semblance of indemnity to the proprietors of Charles River bridge, but the reduction of the annuity to the university ; but this can have no effect, for, in the first place, it falls vastly short of indemnification, and then the government, as contractor, would have no right to be its own measurer of damage.
I make no account of the offers made by the proprietors of Charles River bridge to make such alterations, additions and improvements as might comport with the supposed demands of public convenience or necessity. It was certainly within the discretion of the legislature to accept or reject their offers. If they came to the determination that the new bridge was necessary, or that the safety or convenience of the people required it, they might build it at the public expense, or authorize individuals or a corporation to do it. Not, however, in my opinion, without an indemnity agreed upon, or some constitutional provision to assess it, because it directly trenches upon the income and profits of the old bridge, and not merely as a consequence of alterations or improvements not in themselves affected by any previous contract.
*539 By this course of reasoning my mind is brought to the conclusion, that the act incorporating the proprietors of Warren bridge, in so far as it authorizes, and by its necessary operation occasions the diversion of travel and toll from Charles River bridge, is void, and that the proprietors of the latter bridge are entitled to relief. In what form that relief should be awarded it is immaterial now to determine, as no decree for relief can be passed. There will be a decree against the plaintiffs, in order that they may avail themselves of the right secured by the constitution and laws, of a revision by the Supreme Court of the United States, where it is highly proper that this question, depending, as I think it does, mainly upon the constitution of the United States, should be ultimately decided.
I am aware of objections that may be made to the opinion which I have adopted, that its tendency would be to check and impede public improvements, because the public will not encourage them if they should be subject to the expense of reimbursing those who suffer. But this evil cannot be very extensive within the limitations which 1 have suggested ; certainly less than if it is to be understood, that the legislature, having made a grant of a franchise, may directly or indirectly resume or impair it.
It will be said also, that it is contrary to. the policy and practice of the Commonwealth to make reparation for losses occasioned by turnpike roads, bridges, canals, &c. except for property actually taken for their use. I should answer that no case like the one before us has occurred. In those which most resemble it, such as West Boston bridge, Chelsea bridge, Beverly bridge, Haverhill bridge, &c. an indemnity probably satisfactory to the parties, has been provided for.
There are others of a strong character which have been left without indemnity; the most extraordinary of which is the case of South Boston bridge, which has been entirely destroyed by the free bridge from South Boston to Boston. There is reason to believe, however, that the persons principally interested, acquiesced in, if they did not assist to propure the grant of the free bridge. At any rate, there does not appear to have been any remonstrance to the legislature by the proprietors of South Boston bridge.
*540 There is another feature of the act of 1827, which may fender its validity, in opposition to the rights of the proprietors of Charles River bridge, at least doubtful. It provides, that the , bridge shall be surrendered to and become the property of the Commonwealth in six years from the time of its being opened, or sooner if before that time the proprietors shall have been re-imbursed the expense of building it, with interest at five per cent. The real effect of this provision is, that the bridge is built for the Commonwealth, the proprietors merely advancing the expense, which is to be repaid out of the tolls collected. When this purpose shall be answered, the bridge becomes public property, without any provision for any toll, so that unless some further act of legislation takes place, it will be a free bridge. Now a free bridge so near to the old bridge, it must be obvious to every one, will entirely destroy all beneficial use of the franchise to the proprietors of Charles River bridge. And as there cannot exist a public necessity to give free passage to all people from Charlestown to Boston, such a bridge cannot but be a violation of the contract with those proprietors ; which certainly is, that nothing shall be done by the government to impair that contract, but from necessity.
But suppose the legislature had the right to establish a free bridge, deeming it to be for the public interest and convenience ; then it seems to me, that such a measure would be a virtual assumption of the franchise, and, without compensation, would be void on the principles of both constitutions.
On the other hand, suppose the toll will be continued as long as the charter of the old bridge endures ; then if it shall be paid into the public treasury as a revenue to the State, this revenue would arise from the very act which causes the loss and injury to the proprietors of Charles River bridge.
I do not, however, rest my opinion on this extraordinary provision, because if the act is held valid on the other grounds, this may be cured by future acts of legislation ; or it may be the subject of future adjudication.
I think this question of the necessity of indemnifying the proprietors of Charles River bridge has been prejudiced by the Well known fact, that the profits of the bridge have been great beyond the example of any similar institution in this countrv *541 It seems to me that if the legislature of 1787, which is one year after the building of the bridge, when its success could be only conjectural, and the experiment of its durability was scarcely tried, had incorporated this company to build the Warren bridge, without indemnifying the proprietors of the old bridge, the opinion of its injustice would have been universal.
I cannot see that the principle can be affected by any change of circumstances. Every thing was prospective, and forty years at first, and afterwards seventy, were thought to be a reasonable limitation of the .grant, and the question of loss and gain on both sides was merged in this compact.
If the legislature were to grant a township of land without any reservation, at ten cents per acre, and the purchaser should, by reason of a sudden settlement of the surrounding country, or on account of its favorable position for trade, or its remarkable commodiousness for mills, find it was worth as many dollars, the most ignorant man in the country would stare if the legislature should undertake to resume or curtail its grants.
Besides, notwithstanding the original proprietors and their estates may have been vastly more than indemnified, it is to be considered, that the property in a bridge is a marketable commodity ; that it finds its money value, as other commodities do ; and that the supposed pledged faith of the government in its continuance for the specified time, forms an essential ingredient in the value. It may be presumed, therefore, that many of the present holders are purchasers at a price which will enable them to obtain nothing more than the common rate of interest. A deduction of two thirds of the value of the capital therefore must be a most serious injury. And then again, probably creditors have taken it at the market price, or heirs have taken their portions and lost their right to a new division of the estate. All will see then, that the great profits which have been derived, can have no influence upon the question of right.[1]

Bill dismissed.

 Since this opinion was delivered, I have seen the case of Peter v. Kendall et at. 6 Barn. & Cressw. 703, where there was a demise of a ferry by parol, at an annual rent, and afterward an agreement by parol, that the tenant should become servant to the lessor and should account for the tolls; and it was held, that there was a surrender of the tenant’s interest by operation of law. And the doctrine that the owner of the ferry must own the soil on each side, is expressly denied. The Court held it sufficient if he had a right to use the land for the purposes of a ferry. (Per Putnam J.) .

 See Enfield Toll Bridge Co. v. Connecticut River Co. 7 Connect. R. 28; Piscataqua Bridge v. New Hampshire Bridge, 7 N. Hampsh. R. 35; Warren Bridge v. Charles River Bridge, 11 Peters, 420.